## CHEW HING LUNG v. WISE, COLLECTOR.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 86. Argued December 11, 12, 1899. — Decided January 22, 1900.

Tapioca flour is not a preparation fit for use as starch, and under the tariff act of October 1, 1890, c. 1244, paragraph 720, is entitled to free entry.

The designation of an article, *eo nomine*, either for duty or as exempt from duty, must prevail over words of a general description which might otherwise include the article specially designated.

THE statement of the case will be found in the opinion of the court.

*Mr. A. B. Browne* and *Mr. Albert Comstock* for Chew Hing Lung. *Mr. Charles Page* was on their brief.

*Mr. Assistant Attorney General Hoyt* for Wise and the United States.

MR. JUSTICE PECKHAM delivered the opinion of the court.

The question in this case, which comes before us on certiorari, is whether certain merchandise imported into this country is entitled to free entry or is subject to duty. The merchandise is claimed to be tapioca, and the question arises under the tariff act of October 1, 1890, c. 1244, 26 Stat. 567.

Paragraph 323 (page 588) of the statute reads as follows:

"323. Starch, including all preparations, from whatever substance produced, fit for use as starch, two cents per pound."

Paragraph 730 (page 610) of the "free list," reads as follows:

"730. Tapioca, cassava or cassady."

The government claims that the merchandise is a preparation fit for use as starch, and is therefore dutiable at two cents per pound under paragraph 323.

The importers contend that the substance imported by them

is tapioca, in the form of tapioca flour, which is one of the three forms of tapioca known to commerce, and is therefore entitled to free entry under paragraph 730.

The merchandise was imported in November, 1893, at the port of San Francisco, and the collector of that port imposed a duty of two cents per pound upon it. The importers, claiming that it was entitled to free entry, appealed to the board of general appraisers, and that board decided that the imported article was free of duty, and judgment to that effect was entered. Upon appeal by the collector to the Circuit Court of the United States, in the Ninth Circuit, Northern District of California, that court affirmed the decision of the board, 77 Fed. Rep. 734, and the collector then appealed to the Circuit Court of Appeals for the Ninth Circuit, where the judgment of the Circuit Court was reversed, 48 U. S. App. 517, and the cause remanded with directions to affirm the decision of the collector. Upon application by the importers this court granted a writ of certiorari, it being alleged that there were inconsistent decisions in the Circuit Courts of Appeals on this question.

Upon the trial of the case before the Circuit Court the parties agreed upon certain facts, and evidence was given in regard to the character of the substance imported and its fitness for use as starch, and the court found that the merchandise, though entered at the custom house at San Francisco by the importers under various names, such as tapioca, sago and root flour, is all the same substance, viz., the starch grains contained in and derived from the root botanically known as jatropha manihot. In the West Indies the root is known as cassava or manioc; in Brazil as mandioc; but all these names indicate the same thing, without change of condition or character.

There are two varieties of the root, one of which is very poisonous, and both varieties contain a large proportion of starch. The starchy substance constituting the importations involved in this controversy consists of the starch grains obtained from the manihot root by washing, scraping and grating, or disintegrating it into pulp, which in the poisonous

variety is submitted to pressure so as to separate therefrom the deleterious juices. The starch grains settle and the juice is subsequently decanted, leaving as a deposit a powder, which, after repeated washings with cold water and after being dried, is nearly pure starch, and is insoluble in cold water. This is the substance in controversy. If sufficient heat and motion are afterwards applied to this substance a mechanical change takes place, the grains become fractured and thereby agglutinated. The latter substance is partly soluble in cold water, and is the granulated tapioca known as "pearl" and "flake" tapioca of commerce.

The importations in question are from China, and are made chiefly for the purpose of supplying Chinese laundrymen, who use the flour as a starch and to a slight extent for food purposes. Its use for starch purposes in the laundry is, however, limited to the Chinese, except that in some instances in San Francisco it is so used in their business by white laundrymen by mixing it with wheat or corn starch. Wheat and corn and potato starch are the starches commonly used in the United States. Tapioca flour is also used in the Eastern States by calico printers and carpet manufacturers to thicken colors, and in the manufacture of a substitute for gum arabic and other gums. It is also sometimes used for sizing cotton goods, and in addition as an adulterant in the manufacture of candy and other articles.

Among the white people dealing with the Chinese on the Pacific coast the substance in question is commonly known as "Chinese starch." In the general importing markets of the United States it is commercially known as tapioca flour, and in those markets the term "tapioca" includes that article in three forms, viz., flake tapioca, pearl tapioca and tapioca flour. The substance in question is not imported into San Francisco by others than Chinese.

The Circuit Judge also found that the article in question is fit for use as starch in laundry work in the sense that by its use clothes can be starched, but it is not commonly used in such work as starch, throughout the United States, and is not known to be so used except on the Pacific coast. Judgment was therefore ordered for the importers.

These findings of facts were assumed by the Circuit Court of Appeals, and upon them that court based its judgment, reversing the Circuit Court and affirming the action of the collector.

Upon these facts we are to determine which paragraph in the tariff act is to govern. The findings of the courts below that the substance in question is included in the article of commerce known as tapioca, and is tapioca in one of its forms, would entitle it to free entry under paragraph 730, unless some other provision of the act nullifies that language. Paragraph 323 is relied on for that purpose. We think it does not have such effect. That paragraph is general in its nature, and provides for a duty upon starch, including in that name all preparations from whatever substance produced, fit for use as starch. Any preparation, therefore, which is fit for that use would come within that general designation. What is a preparation " fit for use as starch " is another question, but assuming tapioca flour to be thus fit, it would be subject to duty under that paragraph, if there were not another and different provision in the statute relative to that same substance.

When we come to look at the free list in the same statute we find that tapioca is to be admitted free; and the finding of the court is that tapioca flour is one of the three forms of what is commercially known as tapioca, and under that provision the substance involved in this case would be entitled to free admission. Attempting, as is our duty, to give effect to the statute in all its parts, we think the proper construction of these provisions is that under paragraph 323 a duty is laid upon starch, including all preparations, from whatever substance produced, fit for use as starch; and assuming that tapioca flour is, within that general description, fit for such use, yet by virtue of paragraph 730, tapioca is placed on the free list, and the substance tapioca flour, being tapioca in one of its forms, is excepted from the general language of paragraph 323, and is entitled to free entry.

It is so excepted, because although assuming it to be fit for use as starch, it is nevertheless tapioca, and tapioca is in so many words put on the free list. Effect is thus given to the general language of the paragraph concerning starch and all

preparations fit for use as such, excepting therefrom the one article specially named in paragraph 730, to which effect is given by allowing the exception.

This construction is in strict accordance with the rule that the designation of an article, *eo nomine*, either for duty or as exempt from duty, must prevail over words of a general description which might otherwise include the article specially designated. *Homer* v. *The Collector*, 1 Wall. 486; *Reiche* v. *Smythe*, 13 Wall. 162; *Movius* v. *Arthur*, 95 U. S. 144; *Arthur* v. *Lahey*, 96 U. S. 112; *Arthur* v. *Rheims*, 96 U. S. 143; *Chung Yune* v. *Kelly*, 14 Fed. Rep. 639, 643. The last case involves this particular substance.

It is urged, however, that the provision relating to the free list is that the articles named therein shall be exempt from duty "unless otherwise specially provided for in this act," (page 602, "free list,") and that tapioca flour is otherwise specially provided for in the act by paragraph 323. We cannot concur in this view. Tapioca flour is not otherwise specially provided for in paragraph 323. It is not mentioned specially nor is it named at all in that paragraph, which uses only general language relating to starch and all preparations from whatever substance produced, fit for use as starch. If tapioca flour be such a preparation it would be included in that general description if not otherwise exempted. But there is no special provision for tapioca flour, making that substance, in terms, dutiable under that paragraph, while in the free list there is a special designation of tapioca, and tapioca flour is tapioca, just as much as either of its other forms, "flake" or "pearl," is tapioca.

It would seem that the language at the beginning of the provision for the free list, that the following articles shall be exempt from duty, " unless otherwise specially provided for in this act," strengthened the argument that tapioca flour, being in fact tapioca in one of its well-known forms, was exempt from duty, because in order not to be exempt the article must be otherwise specially made dutiable. It is not so made dutiable, and is therefore by the clear provision of the act made free of duty. Being in truth tapioca, and com-

mercially known as such, it does not come under the description of starch, although in great part composed of that substance. The commercial designation of an article is the first and most important thing to be ascertained, and governs in the construction of the tariff law when that article is mentioned, unless there is something else in the law which restrains the operation of this rule. *Arthur* v. *Morrison*, 96 U. S. 108; *Arthur* v. *Lahey*, 96 U. S. 112; *Arthur* v. *Rheims* Id. 143; *Robertson* v. *Salomon*, 130 U. S. 412; *Bogle* v. *Magone*, 152 U. S. 623.

The case is not within the principle decided in *Magone* v. *Heller*, 150 U. S. 70. There the contest was between a clause of the tariff act of 1883, providing for a duty upon sulphate of potash, *eo nomine*, and a clause exempting from duty "all substances expressly used for manure." It was held that a kind of sulphate of potash, the only common use of which, either by itself or in combination with other materials, was for manure or in the manufacture thereof, was entitled to free entry, and was not subjected to duty as sulphate of potash. Whether the imported article was at the time of importation "expressly used for manure" in the sense defined in the opinion, was held to be a question of fact, and that the court below erred in denying the collector's request to submit the case to the jury and in directing a verdict for the importer. The term "expressly used for manure," it was said, was equivalent to "used expressly" or "particularly" or "especially" for manure, and if it were found as a fact that the article was so used, it was exempt from duty.

If the statute in this case had said that starch was dutiable, including all preparations from whatever substance produced, expressly intended and fit for use as starch, then tapioca flour, if fit and intended for such use, might be dutiable under the paragraph in question, and not be exempt as a form of tapioca. But when the language is, fit for use as starch, it is so much more general, that it is properly qualified by the subsequent paragraph which exempts tapioca, and consequently tapioca flour, one of its commercially known forms.

Thus far we have proceeded upon the assumption that tapi-

oca flour was a preparation fit for use as starch, and, there-fore, dutiable under paragraph 323, unless excepted therefrom by paragraph 730; but we are of opinion that tapioca flour is not a preparation fit for such use within the meaning of the statute. The substance in question is not commercially known as starch, nor as any preparation fit for use as such. In the markets of the United States it is commercially known as tapioca flour, while the term "tapioca" includes precisely the same substance. Its use as starch for laundry purposes is limited to the Chinese on the Pacific coast.

It is not imported into San Francisco by any other than Chinese, nor is it manufactured in this country into the article commonly known as starch, nor is it to any extent used as a substitute therefor, although it is chemically a starch because a large part of it consists of a starchy substance.

Upon the finding and the proofs in this case we are of opin-ion that this article does not come within paragraph 323. We think the language of that paragraph means any preparation which is so far fit for use as starch as to be commonly used or known as such or as a substitute therefor. This substance does not come within that language as thus construed. The use of the article by the Chinese on the Pacific coast for laun-dry purposes is so infinitesimally small that it wholly fails to show that it is fit for that use within the meaning of the statute. The evidence in this case is that the attempt to use it for laundry purposes by white laundrymen in California gave such poor results that it was abandoned as a failure.

There is one finding by the Circuit Judge in this case in which it is said that the substance is used in the Eastern States *for starch purposes* by calico printers and carpet manufacturers to thicken colors; also for book binding and in the manufacture of paper; also for filling in painting, and in the manufacture of a substitute for gum arabic and other gums, sometimes for sizing cotton goods, and also as an adul-terant in the manufacture of candy in some cases and in other articles. The expression in that finding, that the substance is used in the Eastern States *for starch purposes*, is an inad-vertence, because the finding, although it rests upon the evi-

dence as well as upon the agreed statement of facts stipulated between the parties, yet there is nothing in the evidence or in the stipulation to show that the enumerated purposes were starch purposes. In the stipulation it is said that the substance in controversy *is used in the Eastern States by calico printers, etc.* The expression " for starch purposes " does not appear in the agreed statement of facts, and in naming the uses for which the substance is used it would appear that most of them are not what would be ordinarily understood as a starch purpose.

Sizing cotton goods might perhaps be regarded as somewhat of a starch purpose, as starch is sometimes used in that way. The evidence does not show that this use is general, and the expression, fit for use as starch, would not in our judgment include that use. We think it would not in the ordinary acceptation of the term be called a starch purpose. Glue would accomplish much the same purpose and might be used therefor. The use by calico printers and carpet manufacturers to thicken colors is not the ordinary use of starch, nor is it a starch purpose. Nor would its use as an adulterant in the manufacture of candy and other articles be properly described as such a purpose.

Assuming, as counsel for the government claims, and as is undoubtedly entirely true, that the policy shown in the tariff act is protection to American industries, yet the article here in controversy does not and cannot compete with American starch, for any of the purposes for which starch is commonly and ordinarily used in this country. The evidence to that effect, we think, is conclusive.

In *Chung Yune* v. *Kelly*, 14 Fed. Rep. 639, the Circuit Court for the District of Oregon submitted to the jury whether " the article in question," (which was in fact tapioca flour, though imported as sago flour,) " imported and entered by the defendant, is a starch known to commerce as such, and made and intended to be used primarily by laundrymen in the stiffening and polishing of clothes." The jury returned a negative answer, and the court said: " This answer is undoubtedly according to the law and the fact." The

substance was held to be exempt from duty under the tariff act, Rev. Stat. p. 488, as root flour, but the plaintiff was not allowed to recover back the duty which he had paid, because having claimed in his protest that the article was *sago* flour, the court felt compelled to confine him to his specific ground of protest, and consequently the government kept his money, although the importer had in fact imported an article entitled to free entry under the law.

The case of *Townsend* v. *United States*, 14 U. S. App. 413, holds that paragraph 323 of the tariff act of 1890 includes only those preparations which are actually and not theoretically fit for use as starch, and which can be practically used as such, and not those which can be made, by manufacture, fit for such use. Counsel for the government criticises that case as not decided upon the same amount of evidence that has been given in this case upon the question whether the article is or is not fit for use as starch. But in the opinion delivered in the case it is seen that, while not precisely identical, the facts are substantially the same as in the case at bar. The court says the article is used mostly by calico printers and carpet manufacturers to thicken colors and in the manufacture of a substance for gum arabic or other gums ; also for the sizing of cotton goods, a purpose for which starch is also used to a certain extent, but the weight of the testimony was in the opinion of the court that it was not used for laundry purposes. We think the same facts appear in the case before us, the use for laundry purposes by a few Chinese on the Pacific coast not being sufficient in extent to enable us to say that it is so used in any but the most minute quantities. It seems to us clear from the finding and from the evidence that the substance is not commercially known by the people in this country as starch nor as adapted to the ordinary purposes of that article, and it has not been manufactured into commercial starch, and is not known and is not fit for use as such.

The Treasury Department has heretofore announced decisions which are entitled to much weight upon the question herein presented. Prior to the tariff act of July 14, 1870,

c. 255, 16 Stat. 256, 268, both starch and tapioca had been made dutiable, sometimes at the same and sometimes at different rates of duty. By the latter act " tapioca, cassava or cassady " were placed in the free list, while " root flour" was placed in the free list in 1872. (17 Stat. 236.) The Treasury Department held tapioca flour entitled to free entry as tapioca. The Secretary said: "It appears, upon investigation, that tapioca is prepared in three forms, namely, flake, pearl and flour, and that these terms do not indicate any substantial difference in the character or quality of the article, but merely indicate its form or appearance." Decisions, Treasury Department, 1887–1890, No. 3161, March 23, 1877.

Under the act of 1883, (22 Stat. 488, 521,) tapioca was continued in the free list, as was also root flour, (page 520,) while starch was made dutiable as potato or corn starch at a certain rate, " other starch two and one half cents per pound." Page 503. The Treasury Department held, July 7, 1883, that tapioca flour was to be admitted free of duty, without regard to the use for which it was ultimately intended, and that the provision in that act for a duty upon " other starch " than potato or corn starch did not cover tapioca flour. Decisions, Treasury Department, No. 5802.

Subsequently to that time various importations had been made of this article, upon which duties had been assessed at the rate of two and one-half cents per pound, as starch, although imported under various names as " sago, sago crude, sago flour, tapioca," etc.

Exemption had been claimed for these articles as coming under the provisions of the free list as " root flour, sago crude and sago flour," and " tapioca, cassava or cassady." The article had been classified by the collector under the tariff act as " other starch," for the reason that it was, as claimed, imported and was actually used as starch by the Chinese laundries throughout the States and Territories. The department, under date of January 11, 1887, again held that " flour made from tapioca, cassava or cassady root may be admitted free of duties, without regard to the use for which it is ultimately intended." Samples of the flour had been submitted to the

United States chemist, who reported that it was "chemically a starch, obtained from the root of Janipha manihut or Jatropha manihot," yet it was considered in its commercial character to be tapioca; it was so returned by the appraiser, and it was directed that the merchandise should be admitted free of duty. Decisions, Treasury Department, 1887–1890, No. 7971, January 11, 1887.

On September 21, 1888, certain so-called flour was imported which the importers claimed to be free of duty, and upon which the collector assessed a duty of two and one half cents per pound under the provisions of the act already mentioned, providing for such a duty on "other starch," etc. Samples of the merchandise in question were submitted to the United States chemist at the port of New York, who found the article to be tapioca starch, and under the department's decisions of July 7, 1883, and January 11, 1887, it was held that flour made from tapioca, although chemically a starch, was to be admitted free of duty under the provisions for tapioca, without regard to the use for which it was ultimately intended. The appeal was allowed, and the collector directed to reliquidate the entry and to take measures for refunding the duties exacted. Treasury Department Decisions, *supra*, No. 9031.

These decisions were principally based upon the provisions of the acts which related to tapioca, (one decision being exclusively upon the tapioca provision,) and although in some cases in which the question as to tapioca arose, the act also provided for the free entry of root flour, the decisions that tapioca flour was entitled to free entry were substantially founded upon the tapioca provision in the act and not upon the root flour item.

Subsequently, when Congress by the act of 1890 omitted root flour from the free list and imposed a duty upon starch and all preparations, from whatever substance produced, fit for use as starch, we do not think that any argument can be drawn therefrom in favor of the construction which would impose a duty on tapioca flour as a preparation fit for use as starch, while at the same time there is a clause in the act providing for free entry of tapioca, the substance tapioca flour being one of its forms. Many other flours might come under

the denomination of root flour which were not specially declared in the act to be free from duty, and the dropping of the root flour from the free list might relegate such flour to the dutiable list. Not so as to tapioca flour which is still found in the free list. The omission of root flour from the free list, therefore, had no effect upon tapioca flour, and if there had been an intention to include it in the dutiable list, especially after these repeated decisions of the Treasury that it was entitled to free admission as tapioca, we cannot but believe that Congress would have expressed that intention with reasonable clearness.

*The judgment of the Circuit Court of Appeals of the Ninth Circuit should be reversed, and that of the Circuit Court for the Northern District of California affirmed, and the case remanded to that court with such directions, and it is so ordered.*