UNITED STATES *v.* HATTERS' FUR EXCHANGE (No. 4).[1]

1. DOUBT RESOLVED IN FAVOR OF IMPORTER.

   Where from the evidence there may be a doubt whether an article falls within one of two classifications, the doubt will be resolved in favor of the importer.

2. DESCRIPTION EO NOMINE.

   Where an article is designated eo nomine, whether for duty or to be free of duty, such designation must prevail over words of a general description.

3. UNDRESSED SCRAPS OF FUR.

   Fur gathered as scraps or waste from the first treatment of skins is not waste in the strict sense of refuse, but is undressed fur and as such was free of duty under section 561, tariff act of 1897.

United States Court of Customs Appeals, January 18, 1911.

TRANSFERRED from United States Circuit Court of Appeals, for Second Circuit, Abstract 16813 (T. D. 28429).

[Affirmed.]

*D. Frank Lloyd*, Assistant Attorney General (*Charles Duane Baker* on the brief), for the United States.

*B. A. Levett*, for the appellee.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

HUNT, Judge, delivered the opinion of the court:

In 1905, the Hatters' Fur Exchange imported into New York certain merchandise which was returned by the local appraiser as

---

"fur not on the skin prepared for hatters' use." The collector assessed duty at the rate of 20 per cent ad valorem, under paragraph 426 of the tariff act of 1897, which provides that:

426. Furs, dressed on the skin but not made up into articles, and furs not on the skin, prepared for hatters' use, including fur skins carroted, twenty per centum ad valorem.

The importer objected to the classification and assessment, claiming that the merchandise was dutiable under paragraph 463, which reads as follows:

463. Waste, not specially provided for in this act, ten per centum ad valorem.

Or, that it was entitled to free entry under paragraph 561, which reads as follows:

561. (Under the heading "Free List") Furs, undressed.

Or, that it should be admitted free under paragraph 664, which reads as follows:

664. (Under the heading "Free List") Skins of all kinds, raw (except sheepskins with the wool on), and hides not specially provided for in this act.

The collector's decision was reviewed by the Board of General Appraisers and in part sustained, in part overruled. The importer then appealed as to all the protests it had filed, and Judge Martin, sitting in the Circuit Court of the United States in and for the Southern District of New York, modified the decision of the Board of General Appraisers by holding that all of the merchandise was entitled to free entry under paragraph 561 as furs undressed, except certain exhibits, marked 1 and 2, with respect to which the board's view was affirmed. The importer, however, waived its claim as to such goods as were illustrated by the exhibits 1 and 2 referred to, because Judge Hough, sitting in the United States Circuit Court in and for the Southern District of New York, had held in United States *v.* Hatters' Fur Exchange (T. D. 27971) that such merchandise was "waste."

The United States is now before this court praying for a reversal of the judgment of the circuit court as ordered by Judge Martin.

Ten exhibits accompany the record, and it is largely to them that the testimony of the witnesses is addressed. The importer called but one witness, Joseph P. McGovern, who said that he was connected with the Hatters' Fur Exchange; that he knew the articles covered by the invoices in the case, and that he had had over 10 years' experience in preparing fur from the first stages, or from the time that it is on the raw skin, up to the time when it is ready for hatters' use. When his attention was called to Exhibits 1 and 2, and to the decision of

Judge Hough, in the case of United States v. Hatters' Fur Exchange (supra), witness said that Exhibits 1 and 2 were of the same character as the merchandise which was involved in the decision of Judge Hough; that Exhibit 1 was combings, and that Exhibit 2 was "poussiere" or "box waste"; that what was usually called waste is the short material that drops from the skin while it is going through the cutting machine—a very short fiber that is between the pelt and the fur itself that is put into a hat; that combings came in various qualities; that the importations of the so-called combings contain both fur not prepared and hair mixed. Exhibit 1 was marked as a sample of hare comb-ing, and Exhibit 2 was marked as a sample of the cony or rabbit combings.

Witness said that the sample marked "Exhibit 3" was heated fur or "poil echauffe," of the same character as the merchandise furs not on the skin not prepared for hatters' use, passed upon by the Board of General Appraisers in the protests of The Hatters' Fur Exchange (Inc.), G. A. 6246. "Poil chiquettes," which were also entered upon the invoice, were described as produced by being blown from the pieces of rabbit skins and as consisting of fur and hair. "Poil gras" was described as greasy fur, obtained after the bales of furs are compressed, the compression causing grease to ooze through the pelts and to get into the fur. Fur in this condition can not be used by a hatter until it is thoroughly cleansed of the grease. "Poil lapin blanc veule" was described as pieces taken from the white rabbit or fur prepared for hatters' use. Witness said that the importer made no claim as to such fur. "Poil echauffe secrete," sample of which appears as Exhibit 5, was regarded by the witness as waste, similar to heated fur, and carroted. Exhibit 6 was described by the witness as raw tails of the rabbit, fur and hair, all but the bone. They are sold under the name of raw cony tails.

Rabbit snips was the designation applied to certain of the exhibits marked "7" and described as fur on the skin—that is, on pieces of the skin after it is carroted. The tails of the rabbits as they appear after carroting were described as raw heated fur, similar to Exhibit 3. The witness described certain other exhibits, among them one (No. 8) called greasy carroted fur, and said that snips consisted of the stuff that is left after the fur is cut off of the pelt or the bone. "Lat-tones" were raw pieces, like Exhibit 7. "Dags" were described as sweepings off the fur, consisting of the dirt and particles of fur that fall off the skin and are brushed off the floor. Witness said that "brossage" is the stuff that is brushed off the skin after it is carroted in the drying carrot; that the fur sometimes sticks together—or the hair, rather, and it has to be brushed off, so as to free the hair or fur

for the hatter. "Pullings" of the rough hair, according to Mr. McGovern's evidence, are called rabbit down raw and are not used for hatters' purposes at all, but for stuffing pillows. "Culees" are raw pieces similar to Exhibit 7. Witness said that in his opinion the sample represented by Exhibit 5 had been steeped in some preparation to make it look like the carrot which is applied to the best fur that hatters use, and that all that would be necessary to render it fit for use would be to have it cleaned and cleared like cony waste, and then it could be put in as an adulterant, but that by itself it could not be used.

The United States called Henri Picard as a witness. He said he had had 19 years' experience in dealing with hatters' furs; that he had examined the samples offered in evidence, and that he would call Exhibit 5 a bit of pot-carroted, heated fur; that it had been carroted after it had become heated, and was prepared for hatters' use; but witness afterwards admitted that it would have to be blown to be ready for hatters' use; that hatters' fur could not be made out of it without mixing it with something else. Mr. Picard said that the merchandise represented by the various other samples was all waste by-products, obtained in the preparation of skins; that all of the exhibits were furs; that the fur represented by Exhibit 5 was what is called heated fur that comes when they plug the skins—fur that is torn off the pelt; that it falls on the ground, is picked up and put through a process called pot carroting, applied to the pelt. It was the opinion of the witness that Exhibit 5 had been through some process toward preparing it for hatters' use, the process having been a solution of nitric acid used in carroting.

With this evidence before the court, the case has been somewhat simplified by the fact that counsel for the respective parties agree generally that it proves the articles involved to be a waste. We can therefore move forward upon this assumption, and at once proceed to the question whether, being waste, they are clippings or refuse scraps and pieces, dutiable merely as waste not specially provided for or whether, although waste, they are yet articles of undressed fur specially provided for under the paragraphs of the tariff act of 1897 heretofore quoted.

The collector and the board were of opinion that the merchandise is fur; and there is ample evidence to sustain their finding to that effect. As generally understood, fur removed from the skin must be prepared before it can be felted. The long hairs are cut off and the true fur removed by the action of a knife. So, too, the pelts are often greasy and have to be cleansed before shearing. Carroting, a process of heat action, combined with sulphuric acid, is much resorted to in order to increase the felting property of fur. But it is with and to fur that

these and other things are often done, according to the needs of the manufacturer. The finding of the Circuit Court that the articles are undressed clippings of rabbit skins, and portions of fur that have become detached from the pelt by reason of heat and other means, is amply sustained by the evidence, and, as was said by Judge Martin, the evidence shows that they are all "used for the same purpose to which the skin as usually cut up is employed and that it comes from the rabbit pelt, which of itself is treated as free under the tariff act."

It is waste in a sense—that is, it is primarily a refuse in so far as the first treatment of the skin goes, and it may be that the object of the first treatment of the skins is not to obtain this refuse; it is a residuum. But, on the other hand, it is not at all a worthless quantity, as it has a commercial value for use in hatmaking, and is imported for such purposes. The intent of the tariff law of 1897 was explicitly expressed by providing for free entry of skins and furs undressed, and it would seem to us that it was not meant to impose duty upon pieces or inferior kinds of furs, themselves valuable, and gathered as the scraps or waste from the first treatment of the skins, for they are still furs undressed.

At all events, the most favorable view for the Government that can be deduced from the evidence is that the question whether the articles are truly within the term furs undressed or waste in the strict sense of refuse, and as contemplated by the statute as not provided for, is one of substantial doubt. Under such circumstances the difficulty is resolved by the aid of the rule that in construing a tariff law, where there appears to be an equal and substantial balance between alternatives, the doubt should be resolved in favor of the importer. American Net & Twine Co. v. Worthington (141 U. S., 468); Eidman v. Martinez (184 U. S., 578).

We are not unmindful of several rulings of the Board of General Appraisers and of the courts cited to us, where it would appear that articles similar to those herein involved have been classified as waste, but as we read the words of the statute, we do not regard the rule of contemporaneous construction as wholly persuasive in the case.

We hold that the articles, though waste in a narrow sense, are still fairly within the term "furs undressed," and as such are free of duty. And we affirm the circuit court in following the rule laid down in Chew Hing Lung v. Wise (176 U. S., 156), to the effect that where an article is designated eo nomine, whether for duty or to be free of duty, such designation must prevail over words of a general description, which might otherwise include the article specially designated.

*Affirmed.*