(C. D. 487)

W. H. & L. D. Betz v. United States

United States Customs Court, First Division

(Decided May 5, 1941)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* and *J. Stuart Tompkins* of counsel) for the plaintiffs.

*Charles D. Lawrence,* Acting Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.

Before Brown and Tilson, Judges; Brown, J., concurring in the conclusions.

Tilson, Judge: The suits listed in schedule A, hereto attached and made a part hereof, were filed by the plaintiffs seeking to recover

certain sums of money alleged to have been illegally exacted as customs duties on certain imported merchandise, invoiced as seaweed, partly prepared. Duty was levied on said merchandise at 25 per centum ad valorem under paragraph 5 of the Tariff Act of 1930, as sodium alginate. The plaintiffs claim the same to be free of duty under paragraph 1722 or 1750, or to be properly dutiable at only 10 or 20 per centum under paragraph 1558, at 10 per centum under paragraph 1555, or at 10 per centum under paragraph 1540 of said act.

While not abandoning any of their claims the plaintiffs rely chiefly on the claim under paragraph 1540, which paragraph reads as follows:

PAR. 1540. Moss and sea grass, eelgrass, and seaweeds, if manufactured or dyed, 10 per centum ad valorem.

Paragraph 5, under which the classification was made reads as follows:

PAR. 5. All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, 25 per centum ad valorem.

The appraiser at Baltimore in his timely report, states:

Merchandise bought, sold, and invoiced as "Seaweed partly prepared" was analyzed and found to be sodium alginate, a chemical salt or compound, obtained from treating alginic acid with sodium carbonate.

At the trial of this case three witnesses testified for the plaintiffs and one witness testified for the defendant. In addition, the record in a previously decided case, suit 4154, was admitted in evidence in this case, and marked exhibit 102. There were also admitted in evidence two samples of the imported merchandise, marked exhibits 100 and 103, and a composite sample of the merchandise taken from different shipments before the court was admitted in evidence as exhibit 101. There was also admitted in evidence as illustrative exhibit AA a microscopic slide of the plant debris from exhibit 103.

On account of the length of the record before us we shall not attempt any detailed discussion of the same, because to do so would extend this decision to an unwarranted length. We have been favored with well-considered briefs by counsel for both parties.

A decision as to the proper classification of such or similar merchandise was reported as *Betz* v. *United States*, T. D. 46896. The record in that case was admitted in evidence as a part of the record in *Betz* v. *United States*, T. D. 49214, and suit 4154. The decision of the appellate court in suit 4154 is reported in 26 C. C. P. A. 399. In its decision, the appellate court took occasion to state:

We do not think it requires extended discussion or citations of authority to support the conclusion that the imported "Norgine F" is neither seaweed in a

crude state nor should it be regarded as "seaweeds * * * manufactured," for tariff purposes. To be either it is essential that it still be seaweed.

We do not feel that it is necessary or advisable to attempt a review of all the previous litigation on this subject. It is clear to us that if the new evidence offered in this case, considered and weighed in connection with all the other evidence, is not sufficient to require a holding that the imported merchandise is still seaweed, then the decision of the appellate court is decisive of the issue here presented. While we have read and considered the entire record before us, particular attention has been given to determining whether or not the additional evidence requires a holding that the merchandise as imported is still some form of seaweed.

We are not impressed with the plaintiffs' claim that the merchandise is seaweeds, crude or unmanufactured, and this claim may be dismissed without further consideration, as the evidence shows the merchandise is not seaweed crude or unmanufactured. The question of whether or not the merchandise is seaweeds manufactured is not so easily disposed of. In order that we may have a clear understanding of just what manufacturing operations have been performed upon the raw seaweed to bring it to its condition as imported, we quote the following from the testimony of Hans Hamm, as printed in the record in suit 4154:

The seaweed is washed in water and then cut out in pieces 10 cm. long. These pieces are again washed abundantly in water in which sulphuric acid and muriatic acid 2% of each are added. Thereafter the merchandise is again washed in pure water and the acid coating neutralized by means of soda. The seaweed is then dried and again cut into smaller pieces by means of notched rollers. Inasmuch as nothing is taken away from the plant, the partly prepared seaweed possesses all the ingredients contained in the original article.

In this same connection we quote the following from the testimony of Dr. Stein, who had the technical and commercial control of the firm that processed or manufactured the raw seaweed to the state in which it was imported:

The seaweed is treated with acids and then with alkili so that the original indissolvable in water seaweed became dissolvable. Inasmuch as from the plant nothing is taken away, the prepared seaweed possessed all the ingredients contained in the original article.

\* \* \* \* \* \* \*

The merchandise shipped to Messrs. W. H. & L. D. Betz is no extract of algin. It is the whole plant including the original cellulose contained in it. By the treatment described in my answer No. 6, the indissolvable calcilium salt of the laminaric acid contained in the original plant has been changed into dissolvable sodium salt of the laminaric acid.

Adverting now to the new or additional testimony of Dr. Waksman, which was not before this court and the appellate court in the former case, we find that this witness holds a degree of Master of Science from Rutgers University and a Doctor of Philosophy degree from the University of California. These degrees are in the field of biochemistry and microbiology, which deal with the chemistry of living and dead plant and animal tissues and a study of microbes and their effect on plant transformation. In 1931 this witness became associated with the Woods Hole Oceanographic Institute, located in Massachusetts, and has there made a study of microbiology and marine bacteriological forms, and is otherwise well qualified from his vast field of work and experience. This witness testified that the imported merchandise contains all or practically all the organic ingredients which were contained in the original seaweed, and that, as imported, it is not a new product; that the structure of the imported merchandise is not very different from the raw seaweed; the material is not sodium alginate, but is seaweed which has been treated merely to remove the salts; that the process described by Hans Hamm and Dr. Stein is one of the most satisfactory means of preserving seaweed and that the cellulose and lignin in the imported merchandise show that the seaweed nature is still there.

This witness further testified that there is calcium with the alginic acid in the seaweed, and they remove the calcium and substitute the other base which is sodium in this case. This, of course, is done in the processes to which the original seaweed is subjected before importation.

The other witness whose testimony was not in the other case is Edwin M. Ross. He graduated from Lehigh University in 1932 with a degree of Bachelor of Science in chemical engineering, and in 1937 received a degree of Professional Chemical Engineer from the same University. The latter degree was conferred by the University after the witness had produced a satisfactory 5-year operating record, together with an original thesis, which dealt with some commercial applications of sodium alginate. Referring to an analysis of the imported merchandise which he had made, the witness testified that the percentages of alginic acid and cellulose found in the merchandise are within the range of percentages of those substances as found in crude seaweed. "They are in exactly the same proportion as is normally found in raw seaweed, taking into consideration the amount of weight lost in the washing process." Referring to his experimental work with Norgine F, which is another name for the imported merchandise, the witness stated:

Chemically and microscopically, I found it to be identical with seaweed. Of course, that is with the soluble salts and adhering seashells and particles removed.

The constituent parts of the alginate radical and the cellulosic fibers are present in practically the same proportionate amount.

\* \* \* \* \* \* \*

The attorney asked me what characteristics I found in *"Norgine F"* that are similar to *seaweed*, and I stated that chemically and microscopically *I found it to be identical.* [Italics ours.]

This witness further stated that the importers herein do not deal in or sell sodium alginate of any kind as such.

Counsel for the plaintiffs contends in his brief filed herein that this additional new evidence, not in the other case, considered in connection with all the other evidence, requires a holding that the merchandise is seaweed manufactured and as such dutiable under the provisions of said paragraph 1540.

Considering the qualifications of the two witnesses and their direct positive testimony on this particular point, and the fact that no testimony was offered to discredit their testimony, we feel that the record as a whole now supports a finding that the merchandise, as imported, is still seaweed, not the natural seaweed as gathered from the bottom of the ocean, but nevertheless seaweed.

In the case of *United States* v. *Conkey,* 12 Ct. Cust. Appls. 552, the appellate court defined the words "Prepared, or preserved" as follows:

"Prepared, or preserved," as used in the tariff acts ordinarily involves cooking, salting, drying, smoking, curing, or the application of some method or process whereby the fresh or natural condition of the article is so changed as to be more or less a permanent preservation.—*Habicht* v. *United States* (1 Ct. Cust. Appls. 10; T. D. 30772). When used in the tariff sense, the word "prepared" is sometimes used synonymously with preserved, but, in a general sense, it implies that the fresh or raw material has undergone certain mechanical changes, such as cutting, slicing, grinding, mashing, mixing, etc., and usually implies that it has been advanced toward the condition in which it is used, and frequently such preparation either aids or accomplishes preservation.

In the case of *Amerman & Patterson* v. *United States,* 12 Ct. Cust. Appls. 117, the appellate court in construing the provision "edible fruits prepared in any manner," stated:

It appears that the merchandise was produced in the following manner: Pineapples while yet green were peeled, then cut into rectangular pieces, then subjected to fumes of sulphur dioxide, then immersed in brine composed of about 20 pounds of salt to 45 gallons of water, which after several days was replaced by fresh brine apparently of equal strength, then packed in barrels and covered with other brine ready for shipment. The article was intended for use in this country as material in the manufacture of glace pineapple, and it was sliced and treated with sulphur fumes and brine before importation in order to prepare it for that purpose.

\* \* \* \* \* \* \*

Upon these facts we think that the imported merchandise answered to the description of "edible fruits \* \* \* prepared in any manner," and was rightly assessed with duty under the provisions of paragraph 217. At the time of importation the present article was advanced in condition from the tariff status

of mere green or ripe fruit to that of prepared fruit, for the treatment above described was virtually the first step in the manufacture of another commodity, namely, glace pineapple, and the original pineapple was thereby prepared as material for that manufacture.

In *Vitelli* v. *United States*, 4 Ct. Cust. Appls. 75, the appellate court, in holding tomato paste dutiable as vegetables prepared, stated as follows:

The importation the dutiable status of which is questioned by this proceeding is produced from ripe tomatoes, which are conceded to be vegetables as that term is used in the paragraph under which the goods were assessed. To make tomato paste such as that imported, ripe tomatoes, after washing, are lightly crushed by hand and then allowed to stand in the sun a few days in order that the water content may be reduced by evaporation. The pulpy mass is next pressed through a metal sieve, which catches the seeds and skins, but allows the juice and at least some of the pulp to pass through. After again straining the product to remove as far as possible all fibrous and foreign matter it is boiled down to the required density, when it is packed in tins and is ready to be used in the making of sauces.

\* \* \* \* \* \* \*

*The form of the vegetable has been destroyed, of course, but the elements which make the vegetable valuable as a food, namely, a part of the juice and most of the pulp, remain, and we think the paste is just as much a prepared vegetable as would be mashed potatoes, boiled summer squash, or stewed tomatoes.* [Italics ours.]

In the case of *Columbo* v. *United States*, 21 C. C. P. A. 302, mashed ripe tomatoes strained through a sieve into a cheesecloth bag where they were permitted to drain for a period of 24 hours or more, left in these cheesecloth bags and boiled down, then highly salted, put on platters and laid in the sun until the product had come to a consistency that could be easily handled by hand, were held by the appellate court to be "tomatoes prepared or preserved in any manner." It is apparent that if the tomatoes in this case had been so processed that they had lost their identity as tomatoes, the merchandise could not have been held dutiable as "tomatoes prepared or preserved in any manner."

In a technical sense, of course, the salt added to the tomatoes in the *Columbo* case, *supra*, was a chemical compound, having a formula NaCl, and yet the appellate court did not hold the merchandise dutiable as chemical salts or compounds, and combinations and mixtures thereof, but apparently adopted the view that in a popular sense common salt was not a chemical compound, and accordingly held the tomatoes dutiable as tomatoes prepared or preserved in any manner. A similar statement would apply equally to the pineapples and vegetables covered by the other decisions hereinbefore set out.

The above holdings of the appellate court are set out only for the purpose of showing that if pineapples, vegetables, and tomatoes, which have had their physical forms and structures as completely destroyed as shown by the above quotations, are nevertheless pineapples, vege-

tables, and tomatoes, then by the same reasoning the seaweed in this case, although subjected to crushing and the other manufacturing processes hereinbefore detailed, is nevertheless still seaweed. If tomatoes which are washed, then crushed by hand and allowed to stand in the sun a few days, the pulpy mass then passed through a metal sieve which catches the seeds and skins, but allows the juice and at least some of the pulp to pass through, then again straining this product to remove as far as possible all fibrous and foreign matter, then boiled down to the required density and packed in tins, by which processes the form of the vegetable is completely destroyed, are still classifiable as vegetables prepared, then certainly by the same reasoning the seaweed in this case has not so far lost its form and structure as not to be classifiable as seaweed. Not seaweed in its natural state, to be sure, but a form of seaweed nevertheless.

Of course the above quotations and citations are not any authority for holding the imported merchandise to be seaweed manufactured, but they are ample authority for holding it to be seaweed, although crushed and subjected to other manufacturing processes. Whatever else may be said of the imported merchandise, it certainly cannot be said that its natural form is nearly so completely destroyed as was the form of the tomatoes in the *Vitelli* case, *supra*.

There is considerable disagreement among the witnesses and also between counsel as to whether or not the imported merchandise is chemical salts and compounds, or combinations and mixtures thereof, but after a careful consideration of the evidence on this point we do not think there can be any question but that the sodium alginate, which constitutes only 37 per centum of the imported merchandise, is well within the meaning of "all chemical salts and compounds, * * * and all combinations and mixtures of any of the foregoing," in said paragraph 5. But it should be noted that there must also be applied to the foregoing provision the limitation, "not specially provided for." The latter provision, of course, means not otherwise or elsewhere in this act specially provided for. In the absence of either of said paragraphs, the other would undoubtedly claim the merchandise for dutiable classification.

We do not believe it can be seriously doubted that the imported seaweed has been subjected to manufacturing processes, and that as imported the merchandise is in fact seaweed manufactured. In *Murphy* v. *Arnson*, 96 U. S. 131, the Supreme Court of the United States held that the mixture of benzol and nitric acid, which combined by reason of their chemical affinity, and resulted in nitrobenzol, was a manufacturing process, and that the nitrobenzol was a manufacture.

In the case of *Universal Shipping Co.* v. *United States*, 4 Ct. Cust. Appls. 245, the importation involved consisted of merchandise cut

from aluminum sheets into what was generally included under the term "blanks," and in two forms, one square and the other cut in the form of a circle. They were assessed for duty as sheets of aluminum and were claimed dutiable as articles of aluminum partly or wholly manufactured. In sustaining the claim of the importer, the appellate court said:

That these articles were once in the form of sheets is apparent. But they have been advanced beyond that state, and have become articles or wares composed wholly of aluminum, partly manufactured.

In the case of *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, the appellate court quoted the following from paragraph 27 of the act of 1913: "drugs * * * advanced in value or condition by shredding, grinding, chipping, crushing, etc.," and then held that "Any of these operations would ordinarily be a manufacturing process, and might result in a manufactured article, * * *." In the *Ishimitsu* case, *supra*, the merchandise consisted of seaweed boiled with shoyu and packed in hermetically sealed tin cans. In its decision the court said:

So at the most, this imported seaweed, although manipulated and probably advanced in condition, has not been manufactured. It was edible seaweed in its first estate; it is edible seaweed still; it may be more appetizing by reason of the sauce upon it, but that fact does not make it seaweed manufactured.

The manufacturing processes applied to the instant merchandise are so much more elaborate than were the processes applied to the seaweed in the *Ishimitsu* case, *supra*, that the above quotation becomes an authority for holding the instant merchandise to be seaweed manufactured.

So far as our examination of the authorities goes it appears that no definite rule has ever been laid down as to just what processes must be applied to a given article before that article becomes that article manufactured. We are satisfied, however, from our examination of the authorities on the subject and from the evidence herein, that the processes of manufacture applied to the imported seaweed are sufficient to make it seaweed manufactured, and we so hold.

As supporting the above finding we quote the following from the record in the former case, the testimony being given by a witness for the defendant:

Judge BROWN. All the substance of the original plant structure is still there, if I am correct?

The WITNESS. It is still there, but in a different chemical form.

Judge BROWN. In other words, it has been manipulated?

The WITNESS. You are right, yes, sir.

Judge BROWN. You might call it in some sense manufactured?

The WITNESS. Yes, a chemical reaction is a manufacture.

It is rather definitely shown by this record that the raw seaweed as taken from the bottom of the ocean is a chemical compound or chemical salts, or combinations or mixture thereof, and so long as it remains seaweed in any form it retains certain chemical elements, which, in the absence of said paragraphs 1722 and 1540, would require its classification under said paragraph 5. In the case of *Betz* v. *United States, supra,* the appellate court, referring to said paragraph 1540, stated:

It cannot be said that unless the paragraph should be construed to include everything manufactured *from* the articles named there, there would be nothing for the paragraph to operate upon. Without adopting appellant's construction of the controverted paragraph, we can think of many different kinds of manufacturing operations and treatments of the articles named in the paragraph which would permit them to fall within its *eo nomine* provisions and at the same time be manufactured or dyed.

If, as shown by this record, the seaweed, from the time it is gathered from the bottom of the ocean and so long as it remains seaweed of any kind is composed of chemical salts or compounds or combinations or mixtures thereof, which would bring it within the provisions of said paragraph 5, and if paragraph 5 be held to be more specific with reference to the instant seaweed than paragraph 1540, it is not clear to us just what kind of manufacturing operations and treatments of seaweed would permit its classification under said paragraph 1540. Any manufacturing operation or treatment which might be applied to the seaweed would undoubtedly either destroy it as seaweed, or would leave it possessed of chemical salts or compounds or combinations or mixtures thereof, which would require classification under said paragraph 5.

It would therefore appear that if said paragraph 5 be held to cover the instant merchandise more specifically than said paragraph 1540, said paragraph 1540 would be completely inoperative so far as seaweed is concerned. We make no comment with reference to the other merchandise specified in said paragraph 1540, because such merchandise is not before us in this case.

To classify the instant seaweed under said paragraph 5 because it is also a chemical compound or chemical salts or combinations or mixtures thereof, would require a classification of seaweed unmanufactured under the same paragraph for the reason that seaweed unmanufactured is also composed of chemical salts or compounds or a combination or mixture thereof. So long as the imported merchandise is seaweed manufactured, the fact that it is also chemical salts or compounds or combinations or mixtures thereof, even though said chemical salts or compounds or combinations or mixtures thereof were produced by the manufacturing processes applied to it prior to importation, is, in our opinion, immaterial. Seaweed manufactured which

is also chemical salts or compounds or combinations or mixtures thereof is not removed from the specific *eo nomine* provision for sea-: weed manufactured and placed under the general language of said paragraph 5 simply because said chemical salts or compounds or com-. binations or mixtures thereof were produced by some manufacturing process. Paragraph 5 is limited to such chemical salts and compounds and combinations and mixtures thereof as are not otherwise specially provided for.

In view of all the many manufacturing processes to which the imported merchandise is subjected after importation, as shown by the, evidence, in order to obtain therefrom sodium alginate for use as an ingredient in the preparation of a water purifier, it is not easy to understand how, in its imported condition, it could be considered sodium alginate of any kind.

The basic rule to be followed in considering a general enactment and a particular enactment of law is clearly stated by the Supreme Court of the United States in the case of *United States* v. *Chase*, 135 U. S. 255, as follows:

> It is an old and familiar rule that, "where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." *Pretty* v. *Solly*, 26 Beav. 610, per Romilly, M. R.; *State* v. *Comr. of Railroad Taxation*, 37 N. J. L. 228. This rule applies wherever an Act contains general provisions and also special ones upon a subject, which, standing alone, the general provisions would include. Endlich on the Interpretation of Statutes, 560.

The above rule was followed by the Supreme Court in the case of *Chew Hing Lung* v. *United States*, 176 U. S. 156, wherein it was held that tapioca flour, also commercially known as tapioca, imported chiefly for the purpose of supplying Chinese laundrymen, who use the flour as a starch, and to a slight extent for food purposes, was held dutiable under the *eo nomine* provision for tapioca, rather than as "Starch, including all preparations from whatever substance produced, fit for use as starch." The court said:

> It is so excepted, because although assuming it to be fit for use as starch, it is nevertheless tapioca, and tapioca is in so many words put on the free list. Effect is thus given to the general language of the paragraph concerning starch and all preparations fit for use as such, excepting therefrom the one article specially named in paragraph 730, to which effect is given by allowing the exception.

> This construction is in strict accordance with the rule that the designation of an article, eo nomine, either for duty or as exempt from duty, must prevail over words of a general description which might otherwise include the article specially designated. *Homer* v. *The Collector*, 1 Wall. 486, *sub nom. Homer* v. *Austin*, 17 L. ed. 688; *Reiche* v. *Smythe*, 13 Wall. 162, 20 L. ed. 566; *Movius* v. *Arthur*, 95 U. S. 144, 24 L. ed. 420; *Arthur* v. *Lahey*, 96 U. S. 112, 24 L. ed. 766; *Arthur* v. *Rheims*, 96

U. S. 143, 24 L. ed. 813; *Chung Yune* v. *Kelly*, 14 Fed. Rep. 639, 643. The last case involves this particular substance.

A comparatively recent decision by the appellate court, in point here, is the case of *Andrews* v. *United States*, 25 C. C. P. A. 437. The merchandise was a nickel catalyst, which had been classified under paragraph 397 of the act of 1930, as "Articles or wares not specially provided for, * * * if composed wholly or in chief value of * * * nickel," and was claimed to be dutiable as a chemical compound, not specially provided for under paragraph 5 of the act of 1930. In overruling the claim of the importer, the court said:

The term "All chemical elements, all chemical salts and compounds" is a very broad provision covering a multitude of articles. It is equally clear that "all combinations and mixtures" of chemical elements and chemical salts and compounds is an unusually broad provision. The paragraph includes a chemical element or a chemical compound. It also includes combinations (chemical and physical). It includes mixtures of chemicals as well as mixtures of compounds and also mixtures of chemical elements with the different kinds of compounds. Paragraph 397 is limited to articles or wares (and for our purposes it is not necessary to distinguish between the two terms). There are many kinds of metals which may be components of manufactured articles. The provision "articles composed wholly or in chief value of * * * nickel" covers only articles of a particular kind of metal. Unquestionably, this provision is much more specific and definite as applied to the goods at bar than is paragraph 5 (assuming that paragraph 5 describes the importation).

* * * * * * *

Applying the reasoning of the *Lowenthal & Co.* case, *supra*, to the facts at bar, it seems clear that "articles in chief value of nickel" is a much narrower provision and is restricted to a less number of articles than is "all combinations and mixtures of chemical elements."

In the case of *Drakenfeld* v. *United States*, 2 Ct. Cust. Appls., 512, the contest was upon an importation of "cadmium sulphide" or "cadmium yellow," the issue being whether it was properly classifiable as a "pigment" or "color," under paragraph 58 of the act of 1897, or as a "chemical compound or salt," under paragraph 3 of that act. In disposing of the issue in that case the court said:

As applied to the article in hand, it seems that the term pigment or color is more limited and specific than the term chemical compound or salt. The article is in substance a chemical compound or salt, and such is its generic classification; but it is a special kind of chemical compound or salt, namely, one which is used as a pigment or color. By the latter description a limitation is imposed upon the former one. By nature and composition the substance in question is essentially a chemical compound, but it belongs to a species of that general class, namely, the species of chemical compounds which is especially used as a pigment or color. A similar question arose in the case of *Fink* v. *United States* (170 U. S., 584). In that case the article involved was muriate of cocaine. The competing paragraphs were those severally providing for "medicinal preparations" and "chemical compounds or salts." It was held that the article (muriate of cocaine) was both a medicinal preparation and a chemical compound or salt, but that the description by use, as a medicinal preparation, was more specific than that by composition, as

a chemical compound or salt, because it specified a particular and limited class or species of such substances by force of that qualification.

Since it is established by the present record that the instant merchandise is composed of sodium alginate only to the extent of 37 per centum, the following from the case of *United States* v. *Kraemer*, 4 Ct. Cust. Appls. 433, is also particularly applicable:

We pause for a moment to note that the phrase "chemical mixture," under the rules of construction laid down by this court and for many years sanctioned by the Supreme Court, does not mean a mixture made up in a minor part of chemicals, but must be taken to mean a mixture made up substantially entirely of chemicals. *United States* v. *Burne* (4 Ct. Cust. Appls., 298; T. D. 33515); *Kenyon Co.* v. *United States* (4 Ct. Cust. Appls., 344; T. D. 33529).

Again the case of *United States* v. *Holland-American Trading Co.*, 4 Ct. Cust. Appls. 336, the appellate court said:

This polish is apparently composed of pulverized silica, alumina, and lime, saturated and mixed with the petroleum, oil, and fat named in the analysis, resulting in a thick, pasty substance, typical in appearance of similar articles of common everyday use. Chemically speaking, some of the component materials may be chemical compounds or the result of chemical mixture, but we are unwilling to say on the record here that a substance composed so largely of silica, commonly known to be crushed quartz—the sand of the seashore—alumina, one of the most abundant of earths (see Century Dictionary), and petroleum and saponfiable fat is a chemical compound or mixture under paragraph 3.

Tariff statutes are addressed to the common understanding and speak in the language of the common people, unless a different commercial meaning is shown, although, of course, recourse may be had when necessary to technical and scientific works to elucidate the meaning.

Another case in point here is that of *United States* v. *Westrumite*, 1 Ct. Cust. Appls. 400, wherein the court held a mixture of asphalt, paving flux, chemicals and water to be dutiable as "asphaltum, advanced in condition" rather than as a chemical mixture or a chemical compound.

In his brief filed herein counsel for the defendant makes the following statement:

Excluding the natural impurites of debris, ash, and moisture, there in only one chemical compound contained in Norgene F, —sodium alginate.

This statement we consider as a practical concession that the only chemical compound contained in the imported merchandise is sodium alginate, and that the only change in the components of the original seaweed is the change of the calcium alginate to sodium alginate. The record, as now constituted, we feel definitely shows that the imported seaweed is composed of sodium alginate only to the extent of 37 per centum. It is therefore clear that the imported seaweed is not made up or composed substantially entirely or substantially wholly of chemical elements, chemical salts, and compounds, or combinations and mixtures of any of the foregoing, as would seem to be required

by the authorities hereinbefore cited and quoted to bring the merchandise within said paragraph 5.

Neither is it believed that the changing of approximately 25 per centum calcium alginate to 37 per centum sodium alginate, leaving all the other elements as they were in the original seaweed, is such a manufacturing process as would make the imported merchandise sodium alginate or a manufacture of seaweed rather than seaweed manufactured.

By nature and composition the merchandise in question is essentially a chemical compound, but it belongs to a species of that general class, namely, the species of chemical compounds which is specifically provided for as seaweed, if manufactured, in said paragraph 5.

Dr. Waksman testified that the imported merchandise, composed of only 36 or 37 per centum sodium alginate, and 63 or 64 per centum of other substances, based upon his examinations and analyses which he had made, was not sodium alginate:

Because it is sodium alginate to the extent only of one-third. That is, about two-thirds are various other things. I therefore would not call it sodium alginate, any more than I would call this desk cellulose because it has 52 per cent cellulose.

For the reasons hereinbefore stated, and following the authorities, quoted and cited, we hold that the imported merchandise is seaweed, manufactured, and that as applied to the imported merchandise the provisions of said paragraph 1540 are narrower and more specific than are the provisions of said paragraph 5, for "All chemical elements, all chemical salts and compounds, * * * and all combinations and mixtures of any of the foregoing, * * * *not specially provided for."* [Italics ours.]

Our conclusions herein have not been reached by reason of any disagreement we have with the conclusion of our appellate court in the *Betz* case, *supra*, but are based upon the new and additional evidence produced by the plaintiffs at the trial of this case, which was not in the previous case, and consequently not considered by the appellate court in reaching its conclusion. On the record there we are in accord with the conclusion reached.

As to all the merchandise on the invoices covered by the suits listed in said schedule A, which was assessed with duty at 25 per centum ad valorem under paragraph 5 of the Act of 1930, we hold the same to be properly dutiable at only 10 per centum ad valorem under paragraph 1540 of said act, as seaweed, manufactured, as claimed by the plaintiffs.

To the extent indicated the specified claim in said suits is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.

BROWN, Judge: I concur in the conclusions reached.