AMERICAN EXPRESS CO. *v.* UNITED STATES (No. 1947).[1]

1. COMMERCIAL DESIGNATION.

The rule that the commercial designation of imported merchandise may be shown to correspond to the tariff designation applies not only to eo nomine designations but also to descriptive terms.—Pritchard & Co. *v.* United States (2 Ct. Cust. Appls., 247; T. D. 31974) followed, and Bosch Magneto Co. *v.* United States (7 Ct. Cust. Appls., 50; T. D. 36310) overruled. To bar the application of this rule the intention of Congress to do so must clearly appear.

2. CONSTRUCTION—PARAGRAPHS 595 AND 578, TARIFF ACT OF 1913—"IRIDIUM * * * AND NATIVE COMBINATIONS THEREOF * * * WITH PLATINUM"— "PLATINUM * * * IN * * * SHEETS."

The provision of paragraph 595, tariff act of 1913, admitting free of duty iridium and platinum in *native* combination does not modify that of paragraph 578 admitting free of duty platinum in sheets, so as to deny free entry to platinum in sheets when *artificially* combined with iridium.—Bosch Magneto Co. *v.* United States (7 Ct. Cust. Appls., 50; T. D. 36310) overruled.

3. COMMERCIAL DESIGNATION—PARAGRAPH 578, TARIFF ACT OF 1913—"PLATINUM * * * IN * * * SHEETS."

Under a protest claiming free entry of merchandise 90 per cent platinum and 10 per cent iridium as platinum in sheets, under paragraph 578, tariff act of 1913, it was error to exclude evidence of commercial designation.—Bosch Magneto Co. *v.* United States (7 Ct. Cust. Appls., 50; T. D: 36310) overruled.

4. SHEETS OF PLATINUM ALLOYED WITH IRIDIUM.

Sheets of metal, 90 per cent platinum and 10 per cent iridium in artificial combination, if shown to be known commercially as "platinum in sheets" would be admissible free of duty as such under paragraph 578, tariff act of 1913.—Bosch Magneto Co. *v.* United States (7 Ct. Cust. Appls., 50; T. D. 36310) overruled.

United States Court of Customs Appeals, April 13, 1920.

APPEAL from Board of United States General Appraisers, T. D. 37791 (G. A. 8198).
[Reversed.]

*Curie, Smith & Maxwell* (*Thomas M. Lane* of counsel) for appellant.

*Bert Hanson*, Assistant Attorney General (*Charles D. Lawrence, Martin T. Baldwin*, and *Samuel Isenschmid*, special attorneys, of counsel), for the United States.

---

[1] T. D. 38680 (40 Treas. Dec., 208).

[Oral argument Mar. 27 and Oct. 21, 1919, by Mr. Lane and Mr. Baldwin.]
Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise here is sheets or plates of metal (by one witness referred to as "slabs" or "ingots"), 6 inches long, 3 inches wide, and about one-eighth of an inch in thickness, the content being 90 per cent platinum and 10 per cent iridium, artificially combined. The edges are rough. The upper and lower surfaces are smooth, as though hammered or rolled. Such pieces are parts of a larger product from which they have been cut before importation to satisfy the requirements of the importer. Sometimes this metal is imported in similar shapes 2 or 3 feet or more long and 3 or 4 inches or more in width, and not always of the same thickness. It is considered by weight in the customhouse. The importation here was assessed at 50 per cent ad valorem under paragraph 167 of the act of 1913, which provides, among other things, for—

Articles or wares not specially provided for in this section, if composed wholly or in part of platinum, gold, or silver, and articles or wares plated with gold or silver, and whether partly or wholly manufactured * * *.

Importer protested, claiming free entry under paragraph 578, which we quote:

578. Platinum, unmanufactured or in ingots, bars, plates, sheets, wire, sponge, or scrap, and vases, retorts, and other apparatus, vessels, and parts thereof, composed of platinum, for chemical uses.

Claims were also made under other paragraphs unnecessary to mention here.

The Board of General Appraisers overruled the protest, and the case is here for review upon importer's appeal.

In the course of the hearing before the board the importer offered to show that the merchandise, although composed of the two metals above mentioned, was in the wholesale trade and commerce dealing therein in this country known as "platinum in sheets." The board held, however, that—

the provision in paragraph 578 for "platinum in * * * sheets" was a purely descriptive and not a denominative provision, and was therefore not subject to proof on the question of commercial designation—

and excluded the offered evidence. This action was based upon its previous ruling in G. A. 7762 (T. D. 35627), where it had reached a similar conclusion. In that case the judgment of the board was affirmed in this court (see Bosch Magneto Co. v. United States, 7 Ct. Cust. Appls., 50; T. D. 36310) and the Government here largely relies upon that case as ruling this. Later herein that case will be referred to.

The present case was first argued in this court in March, 1919, but desiring further light, particularly upon the question of the

admissibility of proof of commercial designation, reargument was had at the request of the court in October, 1919.

If the excluded evidence ought to have been admitted, we think the case should be remanded and therefore proceed to consider the question of its admissibility.

Although there is no dispute whatever as to the right in proper cases to make proof of commercial designation, it is nevertheless deemed advisable to examine quite fully the force and application of the rule.

In the early case of Two Hundred Chests of Tea (22 U. S., 9 Wheat., 428) the Supreme Court said:

The object of the duty laws is to raise revenue, and for this purpose, to class substances according to the general usage and known denomination of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists or geologists or botanists. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless to attempt any other classification than that derived from the actual business of human life.

The meaning of the term "bohea tea" was the subject of consideration. Referring thereto, the court said that that term—

in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. And even if the article has undergone some variation in quality or mixture, during the intermediate period from 1789 to 1816, when the act last passed, but still retains its old name, it must be presumed that Congress, in this last act, referred itself to the existing standard, and not to any scientific or antiquated standard.

This doctrine has never been departed from by the Supreme Court, but in many cases has been affirmed.

In Arthur *v.* Cumming et al. (91 U. S., 1 Otto., 362) the court considered whether certain merchandise was dutiable as "burlaps" or as "oil-cloth foundations" or "floor-cloth canvas," as to each of which the statute provided that if made or manufactured of flax, jute, or hemp they should be dutiable at certain rates unless within certain prescribed exceptions. Mercantile testimony had been admitted to show that the merchandise was burlap, a manufacture of jute, and not within the exceptions. The same kind of evidence had also been received to show that "floor-cloth canvas" meant the same thing as "oil-cloth foundation" and that the latter were not burlaps. The court sustained the admissibility of this evidence and said, referring to the case of Two Hundred Chests of Tea, supra, and other cases:

The rule to be followed in the construction of revenue statutes in cases like this is well settled in this court. It is, that the descriptive terms applied to articles of commerce shall be understood according to the acceptation given to them by com-

mercial men in our own ports at the time of the passage of the act in which they are found.

In Pickhardt v. Merritt (132 U. S., 252) the statute under consideration provided for "aniline dyes and colors, by whatever name known." It was claimed this was a descriptive and not a commercial term and therefore that evidence of commercial designation was not admissible. The court denied the claim and further held that proof of commercial designation was applicable even though the article in question was unknown when the statute was enacted, citing Newman v. Arthur (109 U. S., 132).

In Barlow v. United States (32 U. S., 7 Pet., 404) it was held that the meaning of the term "refined sugar" was properly shown by proof of commercial designation.

In Hedden v. Richard (149 U. S., 346) a statute providing for "cabinet ware and house furniture, finished," was under consideration and the court held that evidence tending to show the meaning of the word "finished" in the furniture trade was relevant.

In Chew Hing Lung v. Wise (176 U. S., 156), it was said:

The commercial designation of an article is the first and most important thing to be ascertained, and governs in the construction of the tariff law when that article is mentioned, unless there is something else in the law which restrains the operation of this rule.

To the same effect see Robertson v. Salomon (130 U. S., 412).

In Cadwalader v. Zeh (151 U. S., 171) the court reviewed at considerable length the various cases upon this question and used the following language in stating its conclusions therefrom:

It has long been a settled rule of interpretation of the statutes imposing duties on imports that if words used therein to designate particular kinds or classes of goods have a well-known signification in our trade and commerce different from their ordinary meaning among the people, the commercial meaning is to prevail, unless Congress has clearly manifested a contrary intention, and that it is only when no commercial meaning is called for or proved that the common meaning of the words is to be adopted.

Without, so far as appears, undertaking to illustrate every case which would be an exception to this rule, the court did review and analyze cases where it had been held that Congress had "clearly manifested a contrary intention." The first case so referred to was Maillard et al. v. Lawrence (57 U. S., 16 How., 251), in which, as was pointed out, the statute was an exception to the rule because it made "the designed object and actual use of the things the sole test."

Another case was that of De Forest et al. v. Lawrence (54 U. S., 13 How., 274), the rule of which was said to be that—

where goods of a particular kind, which would otherwise be comprehended in a class described by a term having a settled commercial signification, have been described

in the customs laws by a more specific designation and subjected to a distinct rate of duty from that imposed upon the class generally, they are taken out of that class for the purpose of the assessment of duties.

The question in that case was whether dried sheepskins with the wool on should be classified as raw skins or hides. It appeared that for many years such sheepskins had been separately provided for in preceding tariff acts at a specific rate of duty, but that there was no provision for them as such in the act under review. Applying its above rule, the court held that they were dutiable as a nonenumerated article.

Greenleaf *v.* Goodrich (101 U. S., 278) and another case were cited to the effect that the phrase "of similar description" was not a commercial term.

Another illustration was the case of Barber *v.* Schell (107 U. S., 617), in which the words "all manufactures composed wholly of cotton, which are bleached, printed, painted, or dyed" were held not to be affected by commercial usage, because the designation of the articles was by special description of quality or material, as contradistinguished from designation by a commercial name.

Final reference was made to Newman *v.* Arthur (109 U. S., 132), where, in the statute under consideration, the classification was made to depend upon the number of threads to the square inch, which provision, it was said, could not be controlled by commercial evidence as to what goods were usually bought and sold by count of threads.

These cases, illustrating the exceptions to the rule of the general relevancy of proof of commercial meaning, are clearly instances where Congress has indicated an intent that the words were not used in a commercial sense.

Before advancing to the further consideration of this case, it may be observed that there are to be found expressions in some decisions (not, however, of the Supreme Court, so far as we can find) to the effect that the rule of commercial designation applies only to what are called "eo nomine" designations of merchandise. There is no warrant for such a distinction. The case of Two Hundred Chests of Tea, supra, clearly negatives that view, while the case of Arthur *v.* Cumming, supra, expressly holds that descriptive terms are to be applied in their accepted commercial meaning. We so held in Pritchard & Co. *v.* United States (2 Ct. Cust. Appls., 247; T. D. 31974).

Hahn *v.* United States (131 Fed., 1000) is but an adoption of the rule as to the exceptions announced by the Supreme Court. In that case it was held that Congress had signified its intention that evidence of commercial designation was not admissible to show whether half pearls were commercially known as precious stones, which in fact and admittedly they were not, because it had made a

significant distinction between pearls and precious stones in tariff acts.

The distinction to which the court there referred was found in paragraph 434 of the act of 1897, in which there was a provision for jewelry and parts thereof "including precious stones set, pearls set or strung," and this was the expression upon which the court predicated a congressional intent that "pearls" could not by proof of commercial designation be included in "precious stones." As the court well observed, the quoted terms are not correlative and—

If Congress had intended to include pearls in the category of precious stones, a phrase reading "precious stones set or strung" would have more aptly expressed such intention.

It would seem entirely sound to say that when Congress in the same paragraph inserted those two provisions, one immediately following the other, it had indicated that precious stones and pearls were not interchangeable designations for tariff purposes, commercially or otherwise.

Considered without regard to its legislative history and independently of other provisions, paragraph 578 of the act of 1913 is, within the rule of the cited cases, clearly open to proof of commercial designation.

The Government, however, makes two contentions which it claims exclude the application of this rule from the paragraph. They are (1) that the present tariff act bears inherent evidence of a general intent to differentiate between individual metals and the alloys thereof; (2) that the legislative history conclusively proves a congressional intent to exclude from the free list all artificial alloys of the platinum group.

In support of its first contention the Government points out that various paragraphs which it is unnecessary here to mention make specific provision for other metals and their alloys, urging that this mention of alloys is an indication that Congress understood an alloy would not be included within a provision for the metal by name.

Of this contention it may be said that the question here is not as to the interpretation of other paragraphs, but whether the rule of commercial designation is applicable to paragraph 578, and no case is cited which upholds the view that it is not applicable.

It is true that in other paragraphs Congress has seen fit to expressly provide that certain alloys of various other metals are to be classified independently of the metals and has made provisions therefor in considerable detail. Practically all of these metals, however, stand upon a different basis from platinum in that they are produced in this country either to a large or to a considerable extent, while platinum is not.

But there are paragraphs which indicate that Congress understood that a provision for a given metal includes an alloy. To illustrate, paragraph 153 of the act of 1913 provides for—

lead in pigs and bars * * . *; lead in sheets * * *; all the foregoing, 25 per centum ad valorem on the lead contained therein.

This is only consistent with the view that Congress understood that those forms of lead were alloyed.

The only tenable inference we are able to draw upon this phase of the argument is that Congress understood what is common knowledge, that most metals are quite generally alloyed and that to prevent an alloy being classified by proof of commercial designation under the name of its principal metal content it was necessary to provide expressly for the alloy.

The case of In re Guggenheim Smelting Co. (112 Fed., 517) is cited by the Government. In the opinion there is no discussion as to the applicability of commercial designation to the provision for lead in pigs. The merchandise was in fact base bullion containing lead, gold, and silver, lead being the principal component, and the opinion clearly indicates that commercial evidence had been considered by the court.

In Langerman & Petty *v.* United States (75 Fed., 1), which relates to an article composed in part of zinc, the court said it was "commercially known as lithographic zinc sheets" and held it to be "zinc in sheets" within a provision therefor.

In T. D. 16480 (G. A. 3233) the Board of General Appraisers found that an article composed very largely of aluminum but partly of silica was commercially pure aluminum.

In T. D. 24442 (G. A. 5342) "phosphor tin" was claimed to be free as tin in bars, blocks, etc. It appeared that it contained a small percentage of lead or antimony artificially combined therewith, and the board found upon testimony that it was "known and dealt in. as tin."

T. D. 23872 (G. A. 5179) was a case of similar import. So, also,. was T. D. 13808 (G. A. 2002).

The opinion in the case of United States *v.* American Smelting & Refining Co. (5 Ct. Cust. Appls., 398; T. D. 34937) concerning regulus. of copper which was composed of copper, two other metals, and sulphur, shows that evidence of commercial designation was received: by the board.

It does not appear that in any of these last cited cases an issue was made as to the admissibility of such evidence. They are referred. to as indicating that the metal paragraphs have not in practice been regarded as clothed with immunity from proof of commercial meaning to the degree the Government urges.

As to the second above contention of the Government, a somewhat extended consideration is necessary.

It appears that platinum was first recognized by the Spanish in South America in 1737. It was regarded by them as a comparatively worthless silver, from which fact the term "platina," a diminutive of "plata"' (silver), was applied to it. It is a metal of wide distribution, very sparse in quantity, usually found in detrital deposits, especially in auriferous sands, and in its native condition contains iron, copper, often gold, and usually a small portion of the allied metals, iridium, osmium, etc. It is extracted from the ores by both the wet and the dry processes, one of which at least, it seems, does not result in pure platinum, and becomes the subject of commerce in the form of ingots, bars, etc. It is steel-gray or silver white in color and is exceedingly malleable and ductile. The addition of a small amount of iridium hardens it and materially reduces its ductility.

It possesses a particularly valuable property in having a coefficient of expansion approximately equal to that of glass, permitting wires made of it to be sealed into glass vessels without the latter cracking on cooling, and is used in the manufacture of a great variety of electrical apparatus. It is also employed in dentistry and for the manufacture of vessels and other articles for chemical use. Only a very small quantity of this metal is produced in the United States. (Nelson's Encyclopedia, International Encyclopaedia, and Encyclopaedia Britannica.) In the encyclopaedia last cited a method by which it is said pure platinum may be obtained from the commercial metal is described.

The first reference to platinum in our tariff statutes seems to have been in the act of 1832, in which platina without any limitation or specification as to form was given free entry.

In the act of 1883 like favor was given to "platina, unmanufactured," and "platinum, unmanufactured." Although both terms, "platina" and "platinum," were employed, there is now at least no doubt both mean the same thing.

It appears from T. D. 8163, dated April 6, 1887, that in 1853 the Treasury Department had established a practice of classifying platinum in the form of ingots, sheets, or wire, not constituting an article suitable for use without further manipulation, as platinum, unmanufactured. It also appears therefrom that while the act of 1883 was in force a special agent had reported that in view of the fact that paragraph 216 of that act provided for manufactures, articles, or wares, n. s. p. f., of certain metals, including platinum, which metal had not theretofore been specifically mentioned in similar paragraphs of preceding laws, such ingots, sheets, or wire, were dutiable and that the departmental practice of admitting them to free entry should be

modified. The department, however, in substance concluded that platinum in these shapes, if in the condition in which it was first impressed or drawn from the crude material, was still unmanufactured within the meaning of the then existing law, but that if such sheets and wire had "undergone further process than that which brought the crude material into commercial platinum," then they were dutiable.

It may be noted here that this decision recognizes the existence of commercial platinum and also establishes that such platinum had been by the department allowed free entry for more than 30 years.

In T. D. 8203, dated April 29, 1887, the department exhaustively considered the subject of platinum wire. As appears thereby, it had ascertained that platinum was not produced in any substantial amount in the United States and that there were no refineries in this country where the ore could be reduced. The processes by which the other metals and impurities were expelled from the platinum ores before importation were briefly described, after which, to use the language of the department, the platinum was—

put into moulds and then drawn into wire or rolled into sheets, and thus becomes the platinum of commerce. When drawn into wire it is not adapted in that form for any known use.

The department concluded that the wire in question was platinum unmanufactured and entitled to free entry, and expressly stated that it had been so held since 1846.

A somewhat extended discussion is to be found in this ruling of the department. The Treasury regulation of 1853 mentioned in T. D. 8163 was referred to with approval, and it was concluded that the act of 1883 did not change the law or require assessment of duty upon platina in the form of ingots, sheets, etc., or in any shape or form not constituting an article suitable for use without further manufacture.

The cases of United States *v.* Potts et al. (9 U. S., 5 Cranch., 284), Lawrence *v.* Allen et al. (48 U. S., 7 How., 785), and others were cited as supporting the general proposition that imported commodities which were used here only as material and which had not risen to the dignity of a finished article ready for and adapted to some use without further manufacture were, although they had been manipulated and processed abroad, nevertheless not to be regarded as manufactured articles within the contemplation of the tariff law. It was also pointed out that there were various provisions in the act of 1883 for different metals in plates, bars, ingots, and pigs that manifestly were not in the statute regarded as manufactured articles.

As collaterally at least somewhat related to the issue here, we also note that in 1889 (see T. D. 9662) the Secretary of the Treasury ruled that if ores of a certain description were "distinctly known as lead ores in the legal and *commercial* sense, they would as such be dutiable." [Italics ours.]

In paragraphs 681 and 682 of the act of 1890, undoubtedly as a result of the department's views on the subject, as hereinbefore stated, "platina in ingots, bars, sheets, and wire," and "platinum, unmanufactured," were expressly given free entry.

Paragraphs 589 and 590 of the act of 1894 contained these identical provisions and so did paragraphs 641 and 642 of the act of 1897.

During the life of the tariff act of 1897 the Board of General Appraisers considered the subject of platinum in the following cases:

In T. D. 23246 (G. A. 4980) small pieces of platinum clipped from wire and sheets of the metal were held not to be classifiable as waste n. s. p. f., but entitled to free entry as "platinum, unmanufactured." This ruling was followed in T. D. 28361, Abstract 16411, where scrap platinum consisting of worn-out parts of electric switchboards and clipped or broken pieces of other articles were given free entry under the same act.

When it is considered that platinum is a very soft metal, it can hardly be doubted that the scrap platinum of these decisions contained an admixture of other metals, although the abstract opinions do not expressly so state.

In T. D. 27801, Abstract 13923, decided December, 1906, platinum iridium wire and platinum rhodium wire were before the board for classification. How they had been assessed does not appear. They were held, however, to be free of duty under paragraph 642 of the act of 1897 for platinum, unmanufactured. The board said:

The testimony shows that the wire is nine-tenths platinum and that it is used in the same general way and for practically the same purposes as platinum wire, the varying temperatures to which the wire is exposed in chemical experiments being the reason for the admixture of iridium and rhodium. We are of opinion that the presence in the wire of small quantities of these metals—which are, chemically, platinum metals—should not affect their status as platinum for tariff purposes.

The platinum and iridium content of one of these wires, it will be noted, is identical with that of the merchandise in the instant case. While it is not stated that the wires were artificial combinations of the component metals, it would tax credulity to believe they were not.

We find nothing in the statutory enactments or the judicial interpretation thereof which either suggests or leads to the conclusion that the eo nomine provisions for platinum were not under all the tariff acts prior to that of 1909 clearly open to proof of commercial meaning or that only pure platinum was admitted free of duty.

The act of 1909 was patently a revision, so far as the platinum provisions are concerned, of the act of 1897. The two paragraphs of the last-mentioned act, one relating to platina and the other to platinum, 641 and 642, respectively, were combined without change in meaning in paragraph 653 of the act of 1909, and extended to cover platinum in plates, sponge, or scrap. The extension clearly was a

recognition and adoption of the views of the board relating to scrap platinum, as expressed in T. D. 23246 and T. D. 28361 already referred to, and it is significant that in this revision Congress used no language that is susceptible of the interpretation that the board had misapplied the preexisting provisions for platinum in holding that platinum and iridium, and platinum and rhodium wires were entitled to free entry as platinum unmanufactured. (T. D. 27801, Abstract 13923, supra.)

For a long time, as far back at least as the act of 1883, there had been separate paragraphs giving free entry respectively to iridium, osmium, and palladium, with no words of extension or restriction. In T. D. 27409, Abstract 11703, decided in 1906, osmiridium, a naturally formed combination of osmium and iridium, had been assessed as a metallic mineral substance in a crude state. The board, however, held it entitled to free entry under the paragraphs providing for iridium and osmium in the act of 1897, being of opinion that as these two metals were free, a natural combination thereof was entitled to the same privilege. This was followed in T. D. 27550, Abstract 12482, the importation being the same kind of an article.

In the "Notes on Tariff Revision" it was suggested that these separate paragraphs of the preceding act be consolidated in one, that this be enlarged to include rhodium and ruthenium and to provide for native combinations of any of the five metals with one another or with platinum.

An importer had called the attention of the Ways and Means Committee to the fact that rhodium and ruthenium were not found in this country and were charged with duty when imported. (Vol. 3, Tariff Hearings, 1908–1909, p. 2509.) In T. D. 28220 (G. A. 6601) decided in 1907, the Board of General Appraisers had held that rhodium not being expressly given free entry was dutiable. The "Notes on Tariff Revision" also pointed out that osmium was usually found in the form of iridosmium, an alloy of iridium and osmium.

This revision resulted in paragraph 595 of the free list of the act of 1909, which read as follows:

Iridium, osmium, palladium, rhodium, and ruthenium and native combinations thereof with one another or with platinum—

and the separate paragraphs relating to iridium, osmium, and palladium found in the preceding acts disappeared.

The Government relies largely upon the provision in this paragraph for native combinations in support of its second contention, arguing that as free entry is therein expressly given to native combinations, it follows that artificial combinations were intended by Congress to be excluded from that privilege and that thereby Congress indicated its intent to limit the provisions of paragraph 653 of the act of 1909,

subsequently reenacted as already appears in paragraph 578 of the act of 1913.   In support of this view it argues in substance that the eo nomine provisions for iridium, osmium, and palladium in the tariff acts preceding that of 1909 were intended as provisions for the three separate metals only and not for any combinations thereof, at least not for artificial combinations, which is another way of saying that these eo nomine provisions were not subject to proof of commercial designation.

We can not adopt this view.   There is nothing in the language, nothing in the history of these provisions prior to the revision in the act of 1909, that supports this conclusion.   It would be just as reasonable to say the eo nomine provisions for aconite, beeswax, coffee, fossils, gutta-percha (crude), meerschaum (crude or unmanufactured), paraffin, tamarinds, and zaffer were likewise excluded from proof of commercial designation, and these provisions, not limited in any way, may be found in tariff acts prior to 1909 as well as in that and the present statute.   We do not take the time to mention other and numerous paragraphs of which the same may be said, but there are many.   If bohea tea is subject to proof of commercial designation it is difficult to see why coffee or platinum or iridium, etc., should be excluded therefrom.   Eo nomine provisions have always been regarded as especially inviting proof of commerical designation, and to adopt this view of the Government would sweep from the application of that rule a large part of the subjects of commerce referred to in the free list as well as in many of the duty paragraphs of practically every tariff act, the consequences of which could hardly be estimated.

Of course, this contention of the Government is primarily based upon the familiar rule of construction of "Expressio unius est exclusio alterius."

When the whole history of the subject, however, is considered, we think that rule, if otherwise applicable, here must yield to the higher one of commercial designation, of which the Supreme Court has so often said in substance as already appears that the object of the law raising revenue duties is to classify substances according to the general usage and known denomination of trade; that the descriptions of articles in tariff statutes refer to those adopted in trade; that it would be dangerous to adopt any other classification; and that the first and most important thing to be ascertained and which governs in the construction of the tariff laws when an article is therein mentioned is its commercial designation which must always be applied (to use the language of the court), "unless Congress has clearly manifested a contrary intention."

We do not think the revision of the act of 1909 resulting in paragraph 595 is a manifestation of such intention.   In the "Notes on

Tariff Revision" it was pointed out that with the exception of platinum the other metals of the group might be placed in one paragraph. Congress had before it the fact that rhodium and ruthenium had not theretofore been mentioned in tariff statutes, that osmiridium had already been held entitled to free entry, that iridosmium was another form in which two of these metals appeared and that the metals allied to platinum were usually found in some form of combination therewith and it is obvious to us that the provisions of this paragraph were enacted with no intent thereby to restrict or limit paragraph 653 but rather to make sure that there should be no question that native combinations of these free duty metals should have the same privilege as the metals themselves. There was not so far as appears at the time of this revision and the Government does not suggest any reason why the platinum provision should be thus limited. There was no increased production of that metal in this country, there was no diminution in the demand therefor. Whether naturally or artificially combined, if in the forms prescribed in paragraph 653, platinum would still be material and it seems to us absurd to say that a sheet or an ingot or a plate of this metal containing a small percentage of iridium which had been *artificially* combined with platinum would be dutiable, while if containing the same percentage of iridium naturally combined, it would be free, yet such is the result of the Government's contention.

Another result of the Government's claim is that by enlarging the iridium, etc., provision in paragraph 595 so as to give free entry to native combinations, a restriction was imposed upon paragraph 653 resulting in diminishing rather than increasing the quantity of platinum as material which might be admitted to free entry.

These provisions in the act of 1909 having been reenacted in haec verba in 517 and 578 of the act of 1913, it follows that the same views apply thereto.

There appear to have been no relevant decisions of the Board of General Appraisers or the courts under the act of 1909.

The only change that was made in the platinum provision in the act of 1913 was to enlarge in paragraph 565 thereof paragraph 643 of the act of 1909 by giving free entry to ores of the platinum metals.

From this survey of the whole subject the fact at once becomes obvious that whenever a new form of platinum as material appeared in trade or commerce, whether pure or not, for which no special provision had theretofore been made, Congress took especial pains to provide for the free entry of that particular form in the next act and never, unless the Government's present contention prevails, has it indicated any intention of denying free entry to platinum as material or to exclude the provisions therefor from proof of commercial designation.

Of course the underlying reason has always been that only a negligible quantity of platinum and its allied metals is produced in the United States, while the great variety of our manufacturing industries has created an ever-increasing demand for them as material. Such a use of platinum does not require it to be either the pure metal or any natural combination thereof.

In none of the cases to which we have referred on this issue does the question of the admissibility of proof of commercial designation appear to have arisen. That fact does not preclude its relevancy. The right to make such proof in later cases would not be lost because in earlier ones it was not tendered.

Neither, as we view it, would the question of the admissibility of commercial designation necessarily be affected by the fact, if it be so, that the platinum referred to in the earlier rulings of the Treasury Department was pure. If the subsequent development of commerce to meet the requirements of industry resulted in importations of the metal in artificial alloys as well as or instead of natural combinations, the question still would be, if tendered, is it commercial platinum?

As was said in the case of Two Hundred Chests of Tea, supra—

Whether a particular article were designated by one name or another in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. * * * And even if the article had undergone some variations in quality or mixture * * * but still retains its old name, it must be presumed that Congress in this last act referred itself to the existing standard and not to any scientific or antiquated standard.

See also, Elliott v. Swartwout (33 U. S.; 10 Pet., 137).

The fact should be noted here that the record in this case clearly establishes that the merchandise before us is not in its imported condition an article or ware wholly or partly manufactured and ready for a predetermined use. It is exclusively a material and, so far as this importation is concerned, is principally if not altogether used in the manufacture of jewelry, although a witness testified it can be applied to other uses. There is also the undisputed evidence of one witness of 17 years' experience as a metallurgist that pure platinum is too soft for use for commercial purposes. His experience covered the United States and Canada, and he said that the purpose of introducing iridium into platinum was to make it available for "use in any of the trades except the chemical business in commercial laboratories."

The executive interpretation of the platinum provisions is important in determining the contentions of the Government.

In the case at bar an examiner of customs of 20 years' experience testified that since the early part of 1900 he had, at the port of New York, made examinations of importations such as and similar to the one here involved and, prior to our decision in the case of Bosch

Magneto Co. *v.* United States, supra, had always advisorily classified them as entitled to free entry.

The chief liquidator in the collector's office at this port stated that it had been the practice of that office to liquidate free of duties entries so advisorily classified under the relevant platinum paragraphs of the tariff acts of 1890, 1894, 1897, and 1909. It is true that the examiner testified that the merchandise he had advisorily classified as stated had not been tested for iridium in a laboratory, but this does not affect the question of the practice. The customs officers would be presumed to know or to ascertain whenever they deemed necessary the character of the importation and to be cognizant of the interpretation given to the platinum provisions by the Board of General Appraisers and the Treasury Department.

This testimony in connection with what has already appeared as to the rulings of the Treasury Department and the decisions of the Board of General Appraisers satisfies us that until the decision in the Bosch Magneto Co. case, platinum whether in fact pure or naturally or artificially combined with smaller proportions of any of the metals of the so-called platinum group or other metals, provided in its imported condition it was not wholly or partly manufactured into any article or ware ready for use and was in its imported form within paragraph 578 or its predecessors and was material only, has always been given free entry.

For the purposes of this opinion we consider the administrative practice only so far as it relates to the claim of the Government that Congress has never intended to give free entry to platinum unless in a pure state or in the prescribed native combinations.

In Komada & Co. *v.* United States (215 U. S., 392) the authorities are collated. It is said that the reenactment by Congress without change of a statute which had previously received a long-continued executive construction would be deemed an adoption by Congress of such construction. This rule is precisely applicable to paragraph 578 of the act of 1913.

To sum the whole matter up, we conclude that platinum, unmanufactured or not further manufactured than the prescribed statutory forms thereof, has always been entitled to free entry; that, assuming but not admitting, that when it first became a subject of commerce in this country the pure metal only was imported, yet for more than 20 years it has been given free entry when in such forms regardless of whether or not it was the pure metal, provided it was commercially regarded as platinum; that paragraph 517 of the act of 1913 does not indicate any intent on the part of Congress to limit or restrict the provisions of paragraph 578 thereof; and that the provision in the latter paragraph for "platinum, unmanufactured" or

in "ingots, bars, plates, sheets, wire, sponge, or scrap," is subject to proof of commercial designation.

In Chew Hing Lung v. Wise, supra, the Supreme Court said:

The commercial designation * * * is the first and most important thing to be ascertained and governs * * * unless there is something in the law which restrains the operation of this rule.

An intent to bar the application of this "most important" rule must *clearly* appear in order to justify its denial.—(Cadwalader v. Zeh, supra.)

In Bosch Magneto Co. v. United States, supra, the ¡merchandise was wire, 80 per cent of which was platinum and 20 per cent iridium. Proof of commercial designation had been received before it, but the board found that the claim had not been established. It also held that the term "platinum in wire" was not open to such proof.

In this court the judgment of the board was affirmed and we distinctly held that the provision obviously was not a commercial but a descriptive term and that the wire that Congress had made free of duty must be "substantially wholly of platinum," while the merchandise before us was "not such in that it is composed in a substantial part of iridium."

The opinion contains but little discussion of the doctrine of commercial designation, the absence of which suggests that a more extended inquiry might have resulted in a different conclusion. The statement that the term was obviously not a commercial but a descriptive one argues that the opinion was in part at least based upon the mistaken view that descriptive terms were not subject to proof of commercial designation and overlooked the fact that we had already decided otherwise.—(Pritchard & Co. v. United States, supra.)

Upon very mature reflection and careful consideration we are of opinion that in holding that proof of commercial designation was not admissible, error was committed, opportunity to correct which is present here, of which we avail ourselves. So far, therefore, as the views expressed in that case are inconsistent with those here announced, that case is overruled.

The judgment of the Board of General Appraisers is reversed because of error in excluding the offered proof of commercial meaning, and the case remanded for further proceedings not inconsistent with the views herein expressed.

DISSENTING OPINION BY DE VRIES, JUDGE.[1]

The opinion of the majority of the court herein is to my mind so far-reaching in effect and so subversive of former well-settled rules

[1] Filed Mar. 30, 1921.

of import customs construction that this dissent therefrom is recorded. The importation is aptly described therein as follows:

The merchandise here is sheets or plates of metal (by one witness referred to as "slabs" or "ingots"), 6 inches long, 3 inches wide, and about one-eighth of an inch in thickness, the content being 90 per cent platinum and 10 per cent iridium, *artificially combined.* [Italics mine.]

The provisions of the tariff act of 1913, in pari materia, are, in so far as pertinent, these:

167. Articles or wares not specially provided for in this section; if composed wholly or in part of platinum, gold, or silver * * * and whether partly or wholly manufactured, 50 per centum ad valorem.

517. (Free list.) Iridium, osmium, palladium, rhodium, and ruthenium and *native* combinations thereof with one another or with platinum. [Italics mine.]

578. (Free list.) Platinum, unmanufactured or in ingots, bars, plates, sheets, wire, sponge, or scrap * * *.

If any rule of statutory construction may be deemed settled it is, as stated in Volume II, Encyclopedia of United States Supreme Court Reports, page 119, that—

The legislative meaning is to be extracted from a statute as a whole. *Its clauses are not to be segregated,* but every part of a statute is to be construed with reference to every other part and every *word and phrase* in connection with its context, and that construction sought which *will give effect to the whole of the statute—its every word.* * * *

Every phrase of that rule is supported by numerous citations of decisions by the Supreme Court of the United States. The rule as here pertinent was concisely stated in Pollard *v.* Bailey (20 Wall., 520, 525) in these words:

The whole statute must be examined. *Single sentences and single provisions are not to be selected* and construed by themselves, but the whole must be taken together.

That this rule applies to the paragraphs and provisions of revenue laws is long since stare decisis. (Patton *v.* United States, 159 U. S., 500, 509; The Conqueror, 166 U. S., 110; United States *v.* Bun, 159 U. S., 78, 84; Mansfield *v.* Excelsior Refining Co., 135 U. S., 326.) In applying the rule in an import customs case, the Supreme Court, in Kohlsaat *v.* Murphy (96 U. S., 153, 159, and 160), said:

In the exposition of statutes, the established rule is that the intention of the lawmaker is to be deduced from a view of the whole statute, and every material part of the same; and where there are several statutes relating to the same subject, they are all to be taken together, and one part compared with another in the construction of any one of the material provisions, because, in the absence of contradictory or inconsistent provisions, they are supposed to have the same object and as pertaining to the same system. Resort may be had to every part of a statute, or, where there is more than one in pari materia, to the whole system, for the purpose of collecting the legislative intention, which is the important inquiry in all cases where provisions are ambiguous or inconsistent.

The majority opinion herein is predicated in its statutory control upon a single phrase in paragraph 578, without giving any effect

to paragraphs 167 or 517. In my view, if obedience is had to the stated fundamental rule of construction in construing paragraphs 167, 517, and 578, all of which are by Congress in terms related to platinum and its dutiable status, by giving effect to each and every *word* therein, a conclusion contrary to that reached by the majority is inescapable. That rule was followed in Bosch Magneto Co. *v.* United States (7 Ct. Cust. Appls., 50; T. D. 36310). It is by the majority opinion herein ignored.

That opinion thus described the importation, "the content being ninety per cent *platinum* and ten per cent *iridium, artificially combined.*" Paragraph 517 is the only paragraph in the law that fixes, and which does by express words declare, the tariff status of platinum *and* iridium *when combined.* It gives free entry to such only when in "*native* combination." Ex industria it excludes such when as here in *artificial* combinations. Congress having legislated in paragraph 517 as to what "combinations" of "platinum" and "iridium" should be accorded free entry, expressly limited that free entry to "native" combinations of such, and, therefore, to decree free entry of *artificial* combinations thereof legislates out of the paragraph the word "native." A fortiori, Congress in legislating specially and specifically as to free entry of combinations "of platinum *and* iridium," in paragraph 517, having deemed express language, naming each necessary therefor, can not thereafter, in paragraph 578, well be assumed to have spoken of such "combinations" by the use of one only of these words, "platinum."

Because I deem the statute in this case conclusive and that free entry of this merchandise can not be accorded save by amending paragraph 517 by striking therefrom the word "native," it is not the purpose to review the long-continued practice as set forth in the majority opinion. Such, if established, is but a rule of construction and can not be held to vary the plain language of the statute. As stated by the Supreme Court, "A custom of a department, however long continued by successive officers, must yield to the positive language of the statute." (Houghton *v.* Payne, 194 U. S., 32, 100.) Otherwise the law would not be as written by Congress but as read by those to whom it is authority and warrant of action in defiance of the will and command of Congress.

But this opinion by the majority is of more far-reaching consequence than the proper classification of any single class of merchandise. To my mind it strikes a vital blow at and denies Congress a long-exercised and important |power and frequently employed method in import customs legislation. The history of such legislation is replete with efforts of Congress to make effective particular rates of duty by the employment of *descriptive* language. The judicial

history of all tariff acts abounds with instances of the subversion of the purpose of Congress, fixing a rate of duty, expressed in language plain and unambiguous and alike understood and applied by all of common understanding, by the introduction of trade testimony, whereby another understanding would control and a lesser rate of duty thereby be established. In the strife engendered thereby Congress has always heretofore been afforded safety by adopting *descriptive* language. True it was not always easy of determination whether or not particular language was employed by Congress descriptively, and it is not easy to reconcile some of the decisions upon the subject. There, however, runs all through import customs adjudications, frequently upheld and applied, a principle of decision that when Congress employs descriptive language it can not be varied by trade testimony. Consequently the resort by Congress thereto to avoid the uncertainty of defeat of a proposed rate by a Congressionally unknown trade usage was the best, only effective and practicable way whereby Congress could be secure in that result. The majority opinion herein denies Congress that power. It holds that in order to "clearly manifest a contrary intention" by Congress, to avoid, if desired, variance by trade usage, it is not sufficient to use *any* descriptive language per se. To effect this purpose Congress in the majority view must *expressly* declare a contrary intention, either by special words, in addition to the words of description per se, in every tariff designation, or, as it was compelled so to do in the acts of February 8, 1875 (18 Stats., 307) and of May 9, 1890 (26 Stats., 105, C 200), by a general provision, relating to the whole act, of doubtful effect and wisdom.

Aside, however, from the stated effects of the opposing opinion, I can not concur that the rule of decision is as therein stated. It has frequently been stated before this court that the decisions upon this rule of commercial usage are absolutely irreconcilable. Close analysis, however, would seem to confine this criticism more to the statements of the announced abstract rule of decision than to what was actually decided. Thus in Arthur *v.* Cumming (91 U. S., 362) Mr. Justice Swayne, speaking for the Supreme Court, announced the rule, in 1875, as follows:

The rule to be followed in the construction of revenue statutes in cases like this is well settled in this court. It is, that the *descriptive* terms applied to articles of commerce shall be understood according to the acceptation given to them by commercial men in our own ports at the time of the passage of the act in which they are found. (United States *v.* Two Hundred Chests of Tea, 9 Wheat., 230; Elliott *v.* Swartwout, 10 Pet., 151; Curtis *v.* Martin, 3 How., 106.)

The only case affirming the precise doctrine of decision in the broad, unqualified words of Mr. Justice Swayne seems to have been

by Mr. Justice Swayne again in 1880, Recknagel v. Murphy (102 U. S., 197). The rule of decision of the Supreme Court in Arthur v. Cumming was repeated by this court in Pritchard v. United States (2 Ct. Cust. Appls., 247; T. D. 31974), quoting therefrom as law the above copied excerpt. Of what was actually decided in that case, anon.

In Newman v. Arthur (109 U. S., 132–137), decided in 1883, the Supreme Court, however, in effect squarely overruled the announced principle of decision in Arthur v. Cumming and stated the contextual rule of commercial designation as follows:

> It is sought to support this argument by invoking the rule of construing the statute applied in Arthur v. Morrison (96 U. S., 108) and the numerous cases there cited, that where words are used in an act imposing duties upon imports, which have acquired, by commercial use, a meaning different from their ordinary meaning, the latter may be controlled by the former *if such be the apparent intent of the statute;* but the application fails in the present instance because the language used is unequivocal. *There is no reference in the statute, either expressly or by implication, to any commercial usage,* and there is no language in it which requires for its interpretation the aid of any extrinsic circumstances. [Italics mine.]

In Habicht, Braun & Co. v. United States (2 Ct. Cust. Appls., 457; T. D. 32206) this court expressly approved and followed the rule of decision in Newman v. Arthur, that decision having, of course, in effect overruled *the principle* of decision stated in Arthur v. Cumming.

As the previous decision of this court in Pritchard v. United States had announced the principle, which was stated in Arthur v. Cumming, this court, in Habicht, Braun & Co. v. United States, announced the rule in consonance with Newman v. Arthur, which was a later and overruling pronouncement by the Supreme Court of its earlier deliverance.

In no one of the earlier decisions of the Supreme Court was so extended and deliberate thought given the rule as in Cadwalader v. Zeh (151 U. S., 171–175). The precise question was there the sole and controlling issue, and as the extended consideration given the subject forms the basis of all subsequent kindred decisions by the court, and the opposing opinion herein, it may well, as relevant, be here copied:

> The jury were instructed that the word "toys," in common speech, means playthings for children; that the word was to have that meaning in this case, unless the evidence showed that at the time of the passage of the tariff act it had a different trade signification. * * *
>
> The instruction excepted to was in accordance with the uniform current of decision in this court. It has long been a settled rule of interpretation of the statutes imposing duties on imports that if words used therein *to designate* particular kinds or classes of goods have a well-known signification in our trade and commerce, different from their ordinary meaning among the people, the commercial meaning is to prevail, *unless Congress has clearly manifested a contrary intention,* and that it is only when no commercial meaning is called for or proved, that the common meaning of the words

is to be adopted.—United States *v.* Chests of Tea (9 Wheat., 430, 438); Tyng *v.* Grinnell (92 U. S., 467); Arthur *v.* Butterfield (125 U. S., 70); Robertson *v.* Salomon (130 U. S., 412, 415); American Net & Twine Co. *v.* Worthington (141 U. S., 468); Toplitz *v.* Hedden (146 U. S., 252); Nix *v.* Hedden (149 U. S., 304). Among the words to which this rule has been applied are "refined sugar," Barlow *v.* United States (7 Pet., 404); "sugar" and "syrup," United States *v.* Casks of Sugar (8 Pet., 277); "wool" and "worsted," Elliott *v.* Swartwout (10 Pet., 137); "cotton bagging," Curtis *v.* Martin (3 How., 106); "silk veils," Arthur *v.* Morrison (96 U. S., 108); "bar iron," Worthington *v.* Abbott (124 U. S., 434); "furniture finished," Hedden *v.* Richard (149 U. S., 346). [Italics mine.]

It will be noted that this concrete epitome of the correct rule of decision by the Supreme Court seemingly differs from that previously announced in both Arthur *v.* Cumming and Newman *v.* Arthur. The court follows the above declaration by reviewing, as cases in exemplification thereof, and, contrary to what was claimed, consonant therewith, to wit: Maillard *v.* Lawrence (16 How., 251); De Forest *v.* Lawrence (13 How., 274); Greenleaf *v.* Goodrich (101 U. S., 278); Schmieder *v.* Barney (113 U. S., 645); Barber *v.* Schell (107 U. S., 617); and Newman *v.* Arthur (109 U. S., 132).

To my mind the incorrect interpretation by the majority opinion herein of the relation of these cases to the rule stated by the court in Cadwalader *v.* Zeh marks the fundamental error of that opinion. Of their employment that opinion states:

Without, so far as appears, undertaking to illustrate every case which would be *an exception to this rule,* the court did review and analyze cases where it had been held that Congress had "clearly manifested a contrary intention." The first case so referred to was Maillard et al. *v.* Lawrence (57 U. S.; 16 How., 251), in which, as was pointed out, the statute *was an exception to the rule,* because it made "the designed object and actual use of the things the sole test." [Italics mine.]

Plainly the view which interprets these cases as *exceptions to* and *without the rule* previously stated by the Supreme Court is not in accord with and radically differs from the view that they are *within the rule* and exemplifications thereof.

It is the view of this dissent that the reviewed cases were deemed by the court as within the rule and in elucidation thereof. As such they become and are its certain expositors.

Introductory to their consideration the Supreme Court in its opinion states:

None of the cases cited in behalf of the collector *have any tendency to shake this rule;* but are *all of them* depended on special provisions of the statutes.

What are these "special provisions of the statutes" which "do not shake this rule," but which, of course, are therefore consonant therewith? In other words, what "special provisions of the statutes" are held by these reviewed cases to be instances wherein "Congress has clearly manifested a contrary intention" that trade testimony is inadmissible to vary the words of the act? Are any of these cases

wherein the court has held that a descriptive phrase per se is a sufficient manifestation of that congressional intention? If so, those illustrations by the court, *as within the rule,* interpret the rule to apply to such, and it becomes authority for what I deem the well-settled rule, *that descriptive phrases per se manifest the intention of Congress that in such cases the words of Congress and not their commercial meaning shall prevail.* For these enumerated reviewed cases are, by the court in the introductory sentence quoted, declared to be such "special" provisions of the statutes" which do "clearly manifest" such an intention.

While so considering, it may be well to bear in mind precisely what was actually decided in that case. It is a fundamental rule of interpretation that every decision must be read, interpreted, and deemed authority solely with reference and as it applies to its subject matter. Of the innumerable decisions to this effect it will suffice to quote from Downs *v.* Bidwell (182 U. S., 258–9), as follows:

It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated. (Cohens *v.* Virginia, 6 Wheat., 264, 399.)

The stated subject before the court in Cadwalader *v.* Zeh was the word "toys," as used in the tariff act of 1883. The trade testimony reviewed was offered to explain the then pertinent amplitude of that word in trade. "Toys" is an eo nomine designation. The well-settled rule stated, therefore, confines the authority of Cadwalader *v.* Zeh to the doctrine that an eo nomine tariff designation is the subject of trade testimony. All else therein said is "illustration." The decision is not an authority, therefore, that descriptive terms and phrases in an import revenue law are the subjects of trade testimony.

After announcing the quoted rule of decision, supra, the court proceeds to review by way of illustration the several aforesaid cases wherein *some* descriptive terms *perforce their own words of description* and not by virtue of any associate words showing intention, have been held by the Supreme Court not the subjects of trade testimony. Thus, while it was pointed out that the tariff designation *"wearing apparel"* per se denoted a "use," as was held in Maillard *v.* Lawrence, and, therefore, the term itself manifested, beyond its mere descriptive force it may be conceded, an intention to exclude trade classification, the case of Barber *v.* Schell (107 U. S., 617–621) is cited, wherein the court states the descriptive phrase "all manufactures composed wholly of cotton which are bleached, printed, painted, or

dyed" was by the court held to exclude proof of trade usage, solely *because of the intrinsic descriptive force of the term* unaided by any natural implication therefrom or by other words of the paragraph. Likewise is instanced Newman *v.* Arthur (109 U. S., 132), wherein a tariff designation solely by count of threads, usual countable provision, was held not to be controlled by trade testimony, because of the per se descriptive force alone of the phrase. In these and many other decisions of the Supreme Court, unnecessary of citation or review, numerous tariff provisions have been held not the subject of trade testimony by reason of the per se descriptive force, so that the new and unqualified doctrine that descriptive terms and phrases may be the subject of trade testimony finds contradiction not only in numerous well-considered opinions by the Supreme Court, but Cadwalader *v.* Zeh, read in the light of the matter decided and the cases instanced, so rules.

Inasmuch as the court therein declared that Barber *v.* Schell and Newman *v.* Arthur were instances wherein "special provisions of the statutes" "clearly manifested the intention of Congress" not to have used tariff designations in a trade sense, there can be no escape from the conclusion that such phrases, descriptive per se only, are within the rule announced by the court, as a class of the "special provisions of the statutes" "clearly manifesting an intention of Congress" not to have used them in a trade sense.

It is submitted that Cadwalader *v.* Zeh has been correctly interpreted and the true rule concisely announced by the United States Circuit Court for the Second Circuit in Hahn *v.* United States (131 Fed., 1000), as follows:

It is settled law that when an article of importation, *though having a commercial signification, has been plainly and specifically described* in the tariff laws, *the intention of Congress must be looked to* for the purpose of fixing the rate of duty. (Cadwalader *v.* Zeh, 151 U. S., 171.)

To the same effect is United States *v.* Klumpp (169 U. S., 209–216), infra.

That is to say, when we find in the statute a provision levying duty by plainly and specifically *describing* the subject thereof, the ascertained intention of Congress and not trade usage is the controlling rule of construction.

When we bear in mind that the subject of decision in Cadwalader *v.* Zeh was a plainly eo nomine term, "toys," and that it was such the court had in mind when the rule stated was announced, it will readily be seen that in perfect accord therewith is the herein contended true rule that a *tariff designation by descriptive terms, not eo nomine, in the statute per se, clearly manifests an intention of Congress that such a designation is not used in a trade sense.*

The logic of the majority opinion necessarily conduces to its announced conclusion, with the correctness of which I am not in accord. It is as follows:

Before advancing to the further consideration of this case, it may be observed that there are to be found expressions in some decisions (not, however, of the Supreme Court, so far as we can find) to the effect that the rule of commercial designation applies only to what are called "eo nomine" designations of merchandise. There is no warrant for such a distinction. The case of Two Hundred Chests of Tea, supra, clearly negatives that view, while the case of Arthur v. Cumming, supra, expressly holds that descriptive terms are to be applied in their accepted commercial meaning. We so held in Pritchard & Co. v. United States (2 Ct. Cust. Appls., 247; T. D. 31974).

In my view that dénouement is predicated upon an erroneous conception of what is properly included in "eo nomine designations of merchandise." There may be and are, as the statutes witness, more than one kind of eo nomine designations of merchandise, all, nevertheless, eo nomine. An eo nomine designation may include several species of the genus, all each, and the one as well as the other being eo nomine designations. Let us take for illustration from the citations in Cadwalader v. Zeh, page 176. "Sugar" is an eo nomine designation. Equally so is "refined sugar" or "raw sugar." The latter are each, and one as well as the other, "names." They are adjective names, it is true, but nevertheless *names* of well-known merchandise, and, a tariff designation as "refined sugar" or "raw sugar" is an eo nomine designation, as fully as and equally with "sugar" standing alone. And so with "wool," "carded wool," would be equally adjectively eo nomine. Likewise "Bohea tea" is an adjective eo nomine term, as were the "floor-cloth coverings," and "oil-cloth *foundations*" in Arthur v. Cumming. For purpose of the argument it might be conceded that terms *descriptively* eo nomine, the name and not the process or condition being the thing assessed, would be within the rule. Indeed the statement may well be ventured that it will be found upon examination and analysis that in every case wherein the Supreme Court has held a tariff term was the subject of trade interpretation, that part or whole thereof to which the testimony was held properly directed was an eo nomine designation, descriptively or adjectively so, and that regardless of the obviously different principles of decision announced, when used in connection with the subject of decision, all are in accord. That was true also in Pritchard v. United States, where the term was "printing paper," decided by this court an adjectively eo nomine term.

Moreover, this court, in consonance with the settled law and logical sequence, has declared such descriptive or adjective terms eo nomine designations. In Bush & Co. v. United States (6 Ct. Cust. Appls., 192–196; T. D. 35441), speaking through Judge Martin, we said:

The claim of the importers for assessment of the present articles as "*metal* buttons" is sustained also by the history of the successive tariff provisions in relation to buttons. Prior to the tariff act of 1897 there was no eo nomine provision for collar buttons in any tariff act; such articles were therefore assessed under the appropriate provisions for buttons according to the component materials thereof.—(In re Rosenthal, 56 Fed., 1015.)  According to this rule collar buttons made of metal, or in chief value of metal, would have been dutiable as buttons of metal.  In the tariff act of 1897, however, collar buttons (together with cuff buttons and studs) were segregated eo nomine from other buttons, and subjected to a separate rate of duty.  (Par. 414, act of 1897.) This provision covered all collar and cuff buttons regardless of their component materials, and therefore under the act of 1897 all collar and cuff buttons were dutiable under that eo nomine provision of the act.

To the same effect is United States *v.* Klumpp (169 U. S., 209–216), which cites Cadwalader *v.* Zeh in support thereof, as follows:

It will be perceived that the acts of 1890 and 1894 did not levy a duty on "worsted dress goods," eo nomine, nor on worsted dress goods by commercial designation, nor on worsted dress goods as distinguished from woolen dress goods; but a duty on dress goods, whether made of "wool, worsted, the hair of the camel, goat, alpaca, or other animals." *The description is addressed to the quality and material of the goods,* namely, women's and children's dress goods, *made of wool,* worsted, etc.

The principle then that the special designation of an article by *its commercial meaning* should prevail over general terms used in the same or a later act, *has no application.* [Italics mine.]

These designations are all of articles by *names, descriptive,* or adjective names it is true, but, nevertheless, names, eo nomine.

Such should be distinguished from designations of merchandise otherwise than by name, descriptive or in no wise particularized.

There is, however, an essential difference between a tariff designation by a descriptive or adjective *name* and one by a descriptive phrase clearly and specifically levying duty upon a described condition of a named article or merchandise.  In the one the phraseology modifies and designates as dutiable a *named* article.  In the other the phraseology does not so modify but usually designates a condition of a named article or merchandise or of the materials composing the same as the particular dutiable status thereof.  Illustration can not better be had than is afforded by the language of Judge Barber, speaking for this court, in Seligmann et al *v.* United States (6 Ct. Cust. Appls., 85; T. D. 35336):

The importers seek to avoid the controlling effect of that decision by evidence tending to show that the merchandise here was so commercially known as to bring it within paragraph 172, and the board found that prior to the passage of the act of 1909 the merchandise was "definitely, uniformly, and generally recognized in the trade and commerce of this country as *sheet aluminum.*"

We do not think this accomplishes the importers' object, even *if it be conceded for the purposes of the argument* that the term "aluminum in sheets" in paragraph 172 is susceptible of proof of commercial designation.  Proof that the merchandise is commercially known as "sheet aluminum" is not proof that it is known as "aluminum in sheets," which would be necessary. [Italics mine.]

"Sheet aluminum" is a descriptively eo nomine designation. Aluminum *in* sheets is a designation by a described condition of manufacture. The trade knew the former in that case, but the descriptive phrase in the latter was not within the trade nomenclature and was no doubt employed by the Congress to effect the unsuccessful result attempted in that case.

We have here in principle the identical situation. While there are several assignments of error in the record, the precise one upon which the majority predicate their conclusions is thus stated:

In the course of the hearing before the board the importer offered to show that the merchandise, although composed of the two metals above mentioned, was in the wholesale trade and commerce dealing therein in this country known as "platinum in sheets." The board held, however, that "the provision in paragraph 578 for 'platinum in * * * sheets' was a purely descriptive and not a denominative provision, and was therefore not subject to proof on the question of commercial designation," and excluded the offered evidence. This action was based upon the previous ruling in G. A. 7762 (T. D. 35627), where it had reached a similar conclusion. In that case the judgment of the board was affirmed in this court (see Bosch Magneto Co. v. United States, 7 Ct. Cust. Appls., 50; T. D. 36310) and the Government here largely relies upon that case as ruling this.

The majority opinion expressly overrules the decision of this court in the Bosch Magneto Co. v. United States, declared the board in error in not admitting testimony as to the trade understanding *of the phrase* "platinum in sheets," and remanded the case for new trial.

That trial has been had. The board on rehearing, in compliance with the said mandate of this court, gave free hand to the importers to prove of these statutory words and every of them whatever of trade testimony they could adduce. The result is significant and instructive. The record thus made and the decision of the board thereupon is before us and within judicial cognizance. (American Express Co.'s case, G. A. 8401, T. D. 38591). The dénouement of this judicial compliance is aptly expressed in the syllabus of the board's opinion, as follows:

1. The provisions of paragraph 578, tariff act of 1913, cover platinum unmanufactured or in certain prescribed forms, the term "platinum" being used in the commercial sense.—American Express Co. v. United States, suit 1947, reversing Bosch Magneto Co. v. United States (7 Ct. Cust. Appls., 50; T. D. 36310).

4. It is not necessary that the trade proof should establish a commercial designation couched in the precise order and arrangement of the words used in said provision. It is sufficient if such proof discloses (1) that the imported metal is platinum in the commercial meaning of the term, and (2) that it is in the form of a sheet.

A careful reading of that opinion of the board, the syllabus thereto, and the testimony offered leaves no doubt that the importers found it impossible to produce any satisfactory evidence as to any trade meaning of the phrase *"platinum * * * in sheets."* Obviously, therefore, it is not a trade term. As it per se indicates, it is a phrase

so couched by Congress as to designate by description for duty purposes a condition or status of material in the course of manufacture or production. In this respect it has similar associates in almost every paragraph of the act and, which, undisturbed by trade understanding, is absolutely essential in our tariff system, which predicates different rates of duty upon varying degrees of production and manufacture. The board did, however, admit and find satisfactory testimony to establish a trade understanding of a member term of that phrase, the eo nomine word "platinum." Possibly in a proper case any eo nomine member term of a descriptive phrase in a tariff law might be the subject of trade testimony; but, however, whether or not that trade testimony when admitted should be held on final decision to contravene the well established judicially interpreted and long legislatively approved force of a, or the particular eo nomine, word or term, as employed, is a question not presented by *this* appeal, and, in view of the recited status, not here an appropriate subject of discussion or opinion. The eventuation presented, however, confirms the view that eo nomine provisions of tariff laws are, and descriptive provisions are not, the subject of trade testimony. Whatever variance there may be, if any, from that rule, undoubtedly greater uniformity of decision and a more exact enforcement of the congressional purpose will be had by its rigid observance. Perhaps more than in any other branch of the law stare decisis in import customs adjudications is imperatively desirable. The great import trade of the country, the profit or loss in investments and transactions in our import trade involving stupendous sums of money, are by such laws made to depend for success or failure upon a single decision affecting a rate of duty, wherefore, as was said in Perkins *v.* Clements (1 Pat. & R., 141, 153) by the Supreme Court of Virginia:

Without the observance of stare decisis the law is divested of one of its most important attributes, becomes fluctuating and capricious and, instead of being a steady light to guide or shield to protect, becomes an ignis fatuus to mislead or a snare to entrap the citizen.

In conclusion, I feel it my duty to expressly state my dissent from that part of the majority opinion referring to the opinion in Bosch Magneto Co. *v.* United States, reading:

The opinion contains but little discussion of the doctrine of commercial designation, the absence of which suggests that a more extended inquiry might have resulted in a different conclusion. The statement that the term was obviously not a commercial but a descriptive one, argues that the opinion was in part at least based upon the mistaken view that descriptive terms were not subject to proof of commercial designation and overlooked the fact that we had already decided otherwise. (Pritchard & Co. *v.* United States, supra.)

It necessarily appears from the foregoing that, in my limited view, as herein stated, the decision in Bosch Magneto Co. *v.* United States

does not *decide* otherwise than was *decided* in Pritchard & Co. *v.* United States.    Under the doctrine here stated, which is the doctrine of the former decisions, while the reasoning would be different, the conclusion reached in Pritchard *v.* United States would be affirmed. Moreover, it seems due in justification to say that after "more extended inquiry" I am regrettably unable to agree with the majority herein, and that if in error here as well as in the "opinion" in Bosch Magneto Co. *v.* United States, it is error of the mind and not of diligence.    It is my view that the decision of the board should have been affirmed.