SWIFT & CO., A CORPORATION *v.* UNITED STATES (No. 4239)[1]

United States Court of Customs and Patent Appeals, November 29, 1939

*Curtis E. Loehle* for appellant.

*Webster J. Oliver*, Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

[Oral argument October 6, 1939, by Mr. Loehle and Mr. Weeks]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, holding imported oleo stearine subject to a

[1] C. A. D. 83.

duty of 1 cent per pound under paragraph 701 of the Tariff Act of 1930, and, in addition thereto, 3 cents per pound under section 701 of the Revenue Act of 1936 (49 Stat. 1742) amending section 601 (c) (8) of the Revenue Act of 1932, as amended, as assessed by the collector at the port of Baltimore.

Paragraph 701 of the Tariff Act of 1930 and section 701 of the Revenue Act of 1936, so far as pertinent, read:

PAR. 701. * * * tallow, one-half of 1 cent per pound; oleo oil and oleo stearin, 1 cent per pound; dried blood albumen, light, 12 cents per pound; dark, 6 cents per pound.

SEC. 701. TAX ON CERTAIN OILS.

The first sentence of section 601 (c) (8) of the Revenue Act of 1932, as amended, is amended to read as follows:

(8) Whale oil (except sperm oil), fish oil (except cod oil, cod-liver oil, and halibut-liver oil), marine-animal oil, tallow, inedible animal oils, inedible animal fats, inedible animal greases, fatty acids derived from any of the foregoing, and salts of any of the foregoing; all the foregoing, whether or not refined, sulphonated, sulphated, hydrogenated, or otherwise processed, 3 cents per pound; * * * any article, merchandise, or combination (except oils specified in section 601½ of the Revenue Act of 1934, as amended), 10 per centum or more of the quantity by weight of which consists of, or is derived directly or indirectly from, one or more of the products specified above in this paragraph or in section 602½ of the Revenue Act of 1934, as amended, a tax at the rate or rates per pound equal to that proportion of the rate or rates prescribed in this paragraph or such section 602½ in respect of such product or products which the quantity by weight of the imported article, merchandise, or combination, consisting of or derived from such product or products, bears to the total weight of the imported article, merchandise, or combination * * *.

Counsel for appellant conceded on the trial below, and concedes here, that the merchandise was properly classified as "oleo stearin" under *paragraph* 701, *supra*, and that it is dutiable at 1 cent per pound as assessed by the collector. It is contended by counsel, however, that the merchandise is not subject to the additional duty of 3 cents per pound under the provisions of *section* 701, *supra*.

It appears from the evidence of record that oleo stearine is produced from oleo stock, and that the latter is produced from "beef fat"; that in the production of oleo stock the fat is cut into relatively small pieces and put into a "chill-water vat, which is also a washing vat, with a water temperature of around 40 degrees"; that the fat remains in the cold water from 4 to 6 hours, and until it is well chilled; that it is then divided into small pieces, as stated by appellant's witness Chester S. Churchill, "into strings like spaghetti"; that it is then placed in cooking kettles and subjected to temperatures varying from 155° to 170° F.; and that thereafter, as stated by the witness Churchill—

* * * it is settled out with the salt put into the kettle to make a good settle, and the free rendered product, that is, oleo stock, is run off the kettle into small central tanks underneath, and scrap is run into another box for further settling there. The settling tanks underneath we call clarifiers, and it is settled there for a period of two or three hours, with further salting to take out some fine scrap

and whatever moisture is carried through. From the clarifiers it is run into what we call seeding trucks, which hold, perhaps, 800 pounds of this settled, clarified, oleo stock. Where this stock is pressed, it is carried in these trucks for about four days for seeding operations, that is, at a temperature of 90 degrees. This seeding operation is really a separation of the harder part of the fat, called stearine, and the softer part of the fat, which is the oil. After that seeding operation, it is put into cloths in small cakes and put into a knuckle press and pressed. What runs through the bags is oleo oil, and what stays in the bags is oleo stearine. Now the oil, the oleo oil, after it comes from the press, is run into a settling tank, and from the settling tank it is put into tierces. The oleo stearine, if it is to be sold, is in the form of a thin, hard cake.

It further appears from the record that in producing oleo stock the fats are subjected to temperatures not exceeding 170° F.; that *edible tallow* and oleo stock may be produced from fats of the same quality, but by different processes; that in the production of *edible tallow* the fats are neither hashed nor chilled and are subjected to temperatures varying from 236° to 291° F.; that *inedible tallow* is produced by rendering an inferior grade of fat at the same temperatures, from 236° to 291° F., employed in producing *edible* tallow; that *tallow stearine* and *tallow oil* are produced by subjecting *edible tallow* to the same process to which *oleo stock* is subjected for the purpose of obtaining *oleo oil* and *oleo stearine;* that oleo oil and oleo stearine cannot be produced from rendered tallow; that tallow, tallow stearine, and tallow oil are more rancid in flavor and odor and have a higher free fatty acid content than oleo stock, oleo stearine, and oleo oil; that by means of certain tests to determine color, taste, odor, and free fatty acid content, it may be readily determined whether a product is oleo stock or rendered tallow, and whether a beef stearine is obtained from oleo stock or from rendered tallow; and that a beef stearine having a free fatty acid content of "sixteen hundredths of one percent," such as that here involved, is a product produced from oleo stock—beef fats rendered at a temperature not exceeding 170° F.

Evidence was also introduced by appellant for the purpose of establishing that, although, as commonly understood, oleo stock is a high-grade edible tallow, oleo stock and tallow are definitely, uniformly, and generally recognized and dealt in in the trade and commerce of the United States as separate and distinct articles of commerce; that oleo stock commands higher prices than tallow; and that tallow would not be accepted as a good delivery on an order for oleo stock, although, in some instances, oleo stock might be accepted as a good delivery on an order for edible tallow.

Appellant's witness David S. Johnson, a chemist in the employ of Corkran, Hill & Co., testified that a representative sample of the involved merchandise was obtained for, and in the presence of, Mr. Steiner, a representative of the United States Department of Agri-

culture; that he (Johnson) made the necessary and proper tests of such sample to determine its free fatty acid content and its color, odor, and flavor; that the free fatty acid content of such sample was "sixteen hundredths of one per cent," and its "color reading was 20 yellow; 1.8 red"; that its free fatty acid content was as low as is normally present in oleo stearine; and that the sample compared favorably with the oleo stearine used by his company.

On the trial below, counsel for appellant read into the record a regulation on labeling, section 7, paragraph 2, subparagraph (i) on page 36, taken from the regulations governing meat inspection, issued by the United States Department of Agriculture, 1922. The regulation reads:

> Oil, stearine, or stock obtained from beef or mutton fats rendered at a temperature above 170 degrees Fahrenheit shall not be designated as oleo oil, oleo stearine, or oleo stock, respectively.

Counsel for appellant introduced in evidence Illustrative Exhibits A and B, the same being schedules 1 and 2, respectively, of the "Census of Manufactures: 1935," issued by the Department of Commerce, Bureau of the Census, for the purpose of establishing that that department of the Government also distinguishes between tallow on the one hand and oleo stock on the other.

The Government submitted no evidence.

With reference to the regulation on labeling, hereinbefore quoted, issued by the Department of Agriculture, the trial court, in its decision, said:

> The inference to be drawn from this regulation, if it has any bearing upon the classification of imported merchandise, is that since this merchandise is admittedly "oleo stearine" (defendant's brief) it had not been rendered at a temperature exceeding 170° F. and therefore was not a tallow. There is nothing in the regulation in question, however, that defines tallow, hence it was necessary to the importer's case that he establish the meaning of the word tallow.

The court further stated in its decision that—

In our opinion in view of the collector's classification and the presumption which attached thereto, it was incumbent upon the importer to establish by a preponderance of evidence that the imported product was not derived directly or indirectly from tallow, that is, 10 per centum or more thereof. In our judgment he could not meet this burden of proof by evidence which establishes that oleo stearine is obtained from a further processing of oleo stock and that oleo stock is made from beef fat rendered at a temperature of 170° F. according to the process of manufacture in this country. Neither are we impressed with the theory that the regulations of the Department of Agriculture concerning the method of labeling products of beef or mutton fat shall control the customs officials on the classification of such merchandise for duty purposes. A product may be classified under a particular designation of the tariff act and yet be required to have an entirely different label when placed in commerce under food regulations.

*Furthermore, terms used in the tariff acts have long been held to have been used with their commonly accepted meanings or definitions.* (Italics supplied.) If, as the importer contends, oleo stock signifies a generic commodity from which oleo oil and oleo stearine are produced, then he is out of court because of the common meaning of the terms oleo oil and oleo stearine. Oleo oil is defined in Webster's New International Dictionary, Second Edition, as follows:

A yellow oil of buttery consistency expressed from certain animal fats (esp. the high grade of beef tallow known as *premier jus*), the greater portion of the solid fat (oleo stearin) being left behind. It is used in making oleomargarine.

The same authority defines oleo stearine as—

The solid residue of tallow after removal of oleo oil or tallow oil; beef stearin. Its chief use is in lard substitutes.

The court quoted from T. D. 48876, abstracts of decisions by the Commissioner of Customs, dated March 16, 1937, as follows:

(2) *Oleo stock*, edible or inedible, having a titer test of 40° C. or over, is classifiable as tallow under paragraph 701 of the Tariff Act of 1930 and section 601 (c) (8) of the Revenue Act of 1932, as amended by section 701 of the Revenue Act of 1936. Oleo oil and oleo stearine derived from such oleo stock or from any other product specified in section 601 (c) (8), as amended, are subject to the appropriate import tax under such section. * * *

It also referred to and quoted from "Chemical Technology and Analysis of Oils, Fats, and Waxes," by Dr. J. Lewkowitsch, Fifth Edition, Vol. II, page 756 and Vol. III, page 26, and the Summary of Tariff Information, 1920, page 793, and said: .

Since all the sources of information, common, scientific, and legislative, clearly indicate that Congress in making the various tariff provisions involved must have understood that oleo stearine is a derivative of tallow, it therefore follows that the instruction of the Commissioner of Customs to collectors in T. D. 48876, *supra*, is in accordance with the intention of Congress, and that oleo stearine is properly classified as a derivative of tallow under section 701 of the Revenue Act of 1936, *supra*.

We deem it unnecessary, therefore, to enter into a discussion of the evidence on the question of commercial designation, especially as that is based upon statements as to an article produced in this country and no competent testimony was adduced as to the method of producing the imported article in Australia.

The court, accordingly, held that the involved oleo stearine was subject to the additional duty of 3 cents per pound under section 701 of the Revenue Act of 1936, *supra*.

It clearly appears from the authorities cited in the trial court's decision, as well as from other dictionary definitions and the Summary of Tariff Information, 1929, on the Tariff Act of 1922, Schedule 7, page 1031, and it is conceded by counsel for appellant that, as commonly understood, oleo stock is merely a high-grade edible tallow.

It is well settled that tariff statutes are directed to trade and commerce, and that tariff terms are used by the Congress in their known commercial sense, unless a contrary intention clearly appears. *American Express Co.* v. *United States*, 10 Ct. Cust. Appls. 275, T. D.

38680, and cases therein cited and reviewed; *La Manna, Azema & Farnan* v. *United States*, 14 Ct. Cust. Appls. 289, T. D. 41908; *Rice Millers' Association, etc.* v. *United States and Oberle (Inc.)*, 15 Ct. Cust. Appls. 355, T. D. 42560.

In the case of *Two Hundred Chests of Tea*, 22 U. S. 428, cited in the case of *American Express Co.* v. *United States, supra*, the Supreme Court said:

If we were to advert to scientific classifications, for our guide on the present occasion, it is most manifest, from the works cited at the bar, that bohea is a generic term, including under it all the black teas, and not merely a term indicating a specific kind. But it appears to us unnecessary to enter upon this inquiry, because, in our opinion, congress must be understood to use the word in its known commercial sense. The object of the duty laws is to raise revenue, and for this purpose, to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists or botanists. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification, than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation.

It is also well settled that it will be presumed, in the absence of evidence to the contrary, that the commercial meaning of a tariff term is the same as its common meaning. Furthermore, the burden of proving commercial designation is upon the party who asserts that the commercial meaning of a tariff term differs from its common meaning. *Rice Millers' Association, etc.* v. *United States and Oberle (Inc.), supra.*

Appellant has established, at least *prima facie*, in the case at bar that oleo stearine is produced from oleo stock; that oleo stock and tallow are definitely, uniformly, and generally considered and dealt in in the trade and commerce of the United States as separate and distinct articles of commerce; that oleo stock commands higher prices than tallow; and that tallow would not be accepted as a good delivery on an order for oleo stock, although, in some instances, oleo stock might be accepted as a good delivery on an order for edible tallow.

It appears from the record that, although both rendered edible tallow and oleo stock may be produced from the same beef fats, the process of producing oleo stock differs from the process used in producing rendered edible tallow; that, in the production of oleo stock, beef fats are subjected to a temperature not exceeding 170° F. Indeed, under the regulations of the Department of Agriculture, a product produced by rendering fats at a higher degree of temperature

may not be dealt in legally in the commerce of the United States as oleo stock, nor may oil or stearine produced from such product be designated in the trade and commerce of the United States as oleo oil or oleo stearine.

As hereinbefore noted, it clearly appears from the evidence that oleo stock and its derivatives, oleo stearine and oleo oil, differ from rendered edible tallow and its derivatives, tallow oil and tallow stearine, in odor, flavor, and the free fatty acid content, the rendered tallow and its derivatives having a more rancid flavor and odor and a higher free fatty acid content; that whether an article is oleo stock or a derivative thereof, or rendered tallow or one of its derivatives, can be readily determined by tests fully set forth in the record; that the involved oleo stearine was subjected to such tests; that it conformed in flavor, odor, and free fatty acid content to oleo stearine produced in the United States; and that as it had a free fatty acid content of "sixteen hundredths of one per cent" it must necessarily have been produced from beef fats rendered at a temperature not exceeding 170° F.; that is, oleo stock.

"Tallow," as commonly understood, has two meanings. Broadly, it includes the animal fat from which oleo stock and rendered tallow are produced. It is defined by the lexicographers as—

1. Animal fat, esp. suet.

2. a The fat of animals of the ox and sheep kinds (beef and mutton tallow respectively), extracted from membranous and fibrous matter by melting. It is white and almost tasteless when pure, and is used in soap and candles, in oleomargarine, etc. The solid consistency of tallow is due to the large proportion of glyceryl esters of stearic and palmitic acids. See fat, n., 2 & 8. b The fat of some other animals, or from certain plants, or other sources, like the fat of the sheep and ox. (*Webster's New International Dictionary, Second Edition*.)

1. A substance composed of the harder and less fusible fats, being a mixture of olein, palmatin, and stearin, best obtained by rendering beef- or mutton-fat (called *suet* when containing cellular tissue); by extension, almost any animal fat; also, any of certain vegetable fats. (*Funk & Wagnalls New Standard Dictionary, 1931*.)

1. The fat or adipose tissue of an animal, esp. that which yields the substance described in 2; suet. * * *

2. A substance consisting of a somewhat hard animal fat (esp. that obtained from the parts about the kidneys of ruminating animals, now chiefly the sheep and ox), separated by melting and clarifying from the membranes, etc., naturally mixed with it * * *. (*Oxford, A New English Dictionary on Historical Principles, 1919, Vol. IX*.)

No evidence was introduced by appellant for the purpose of establishing that the commercial meaning of the term tallow differs from its common meaning, and that in the trade and commerce of the United States the term "tallow," definitely, uniformly, and generally, includes only *rendered* animal fat. That being so, we must assume, for the purpose of this decision, that as commonly and commercially

188

understood the term "tallow" includes the harder and less fusible unrendered beef fats.

Oleo stock and rendered tallow being derivatives of the harder and less fusible unrendered beef fats, they are both derivatives of tallow. It is evident, therefore, that proof that oleo stock and *edible* tallow are generally, uniformly, and definitely recognized in the trade and commerce of the United States as separate and distinct commercial articles is not sufficient to establish that oleo stock and oleo stearine are not produced from tallow.

In view of the fact that section 701 of the Revenue Act of 1936, *supra*, covers not only tallow but also any article derived either directly or indirectly therefrom, we must hold that the involved oleo stearine is subject to the additional duty of 3 cents per pound provided for therein. For the reasons stated, the judgment is *affirmed*.